587 A.2d 527

**CLOVERLAND FARMS DAIRY, INC.**

v.

**Alfred J. FRY, Jr.**

No. 29, Sept. Term, 1990.

Court of Appeals of Maryland.

March 27, 1991.

Motion for Reconsideration Denied May 3, 1991.

Nathan Patz, Alan Abramowitz, Baltimore, on brief, for petitioner/cross respondent.

David A. Simison, Millersville, for respondent/cross petitioner.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ.

MURPHY, Chief Judge.

The question presented is whether the term "gross sales," used in a retail food store lease to determine the amount of additional percentage rent to be paid by the lessee, included the gross receipts realized from the lessee's sale of lottery tickets.

## I.

On August 29, 1969, Cloverland Dairy Farms, Inc. leased land in Anne Arundel County from Alfred J. Fry, Jr. for a term of forty years. The lease provided that Cloverland would construct a building on the property to be used "for the conduct and operation of a retail food store, including as products farm and milk products and by-products and all such other wares and articles of merchandise" as may be sold in a Business Retail zoning classification. The lease further provided that Cloverland would pay, as rent, $375 per month and, as additional rent, an amount equal to a specified percentage of "gross sales made in the store" during the calendar year, less the total monthly rental paid

during the preceding calendar year. Specifically, the lease provided:

> "In computing sales for the purpose of this provision, Lessee shall take the total amount of sales of every kind made in the store on the leased premises and deduct therefrom the following, to the extent that same are included in such total amount: (1) refunds made to customers, (2) sales, excise and gross receipts taxes, and (3) proceeds from sale of money orders (fee received for issuance of money orders shall not be deducted)."

When the lease was executed in 1969, the sale of lottery tickets was illegal in Maryland. Three years later, the General Assembly authorized the sale of lottery tickets by agents of the State, the proceeds to be collected for the State's use and account. The selling agents were entitled to retain a specified commission from the sale of the tickets. In 1983, Cloverland was licensed as a lottery agent and began selling tickets on the leased premises. In the ensuing years, in computing the amount of its gross sales for purposes of paying the percentage rental required by the lease, Cloverland included only commissions retained by it from the sales of lottery tickets rather than the gross receipts realized from the sales.

In March, 1988, following Fry's claim that the percentage due under the lease applied to the full dollar amount of all lottery sales made on the leased premises, Cloverland filed a declaratory judgment action in the Circuit Court for Anne Arundel County. It asked the court to construe the lease to exclude the gross receipts from the sale of lottery tickets from inclusion within the term "gross sales," as used in the lease; and to conclude that the percentage rental payable by Cloverland to Fry on its sale of lottery tickets was limited to the amount of commissions received by it for making such sales. In a counterclaim, Fry sought a declaration that the lease covered all sales within the definition of "gross sales," including the sale of lottery tickets, and that the percentage rental be so calculated.

Upon motions for summary judgment filed by each party, the trial court (Duckett, J.), after a hearing, determined that the gross receipts from the lottery sales fell within "the sales intended by the parties to be included within gross sales for the purposes of calculating the percentage rental as such intent is evidenced by the clear and unambiguous language of the lease." In this regard, the court said that the clear import of the lease required that *"all sales of any kind* made in the store on the leased premises are to be included in gross sales for the purpose of computing the percentage rental." (Emphasis in original.) It said that the language of the lease did not "limit the applicability of the percentage rental to only those sales made by Cloverland of products which were in existence and within the contemplation of the parties at the time the lease was executed." Moreover, according to the court, the lease did not limit the applicability of the percentage rental to only sales made by Cloverland itself or as principal. Consequently, the court concluded that the lease did not distinguish between sales made by Cloverland from its inventory and those made by it as agent for another. The court also found that the fact that lottery sales were illegal at the time the lease was executed, and thus were not within the contemplation of the parties, was irrelevant.

Finally, the trial judge made these observations:

"In agreeing to calculate the percentage rental based on gross sales, the parties manifested an intent to disregard the profits or losses realized by Cloverland in determining Cloverland's rental obligations. Both parties are bound by that determination. Cloverland must pay percentage rental on every sale that occurs in the store on the premises. In deciding whether to make a sale, or permit a sale to be made, Cloverland is confronted with a business decision. This decision is no different in the case of lottery tickets than it is in the case of a loaf of bread. As Cloverland must determine whether selling the loaf of bread will yield a profit, it must also determine whether selling a lottery ticket will yield a profit. The

fact that Cloverland, in the case of the loaf of bread, 'pays' its supplier for the loaf, sells it for a higher price and retains a profit and, in the case of a lottery ticket, sells the ticket, remits the receipts to the State of Maryland and retains a commission authorized by statute is irrelevant."

Cloverland appealed to the Court of Special Appeals. We granted certiorari prior to that court's consideration of the issue raised in the case.

## II.

The Maryland State Lottery Law was enacted by ch. 365 of the Acts of 1972, now codified as Maryland Code (1984), §§ 9–101 to 9–125 of the State Government Article. Under its provisions, the Director of the State Lottery Agency is authorized to license agents to sell lottery tickets. § 9–112. The licensed sales agents are authorized to receive regular commissions not to exceed 5% of gross receipts, as well as "special bonuses or incentives" within a designated sum. § 9–117. Except for these amounts, "all of the receipts from the sale of State lottery tickets are due to the Agency on the due date that the Agency sets." § 9–119.

Because the sale of lottery tickets was illegal in Maryland when the lease was executed in 1969, Cloverland renews its argument that such sales were not within the contemplation of the parties in calculating "gross sales" subject to the percentage rental clause of the lease. Cloverland maintains that this intention is readily evident from the provision in the lease, which explicitly authorizes a deduction from gross sales of all receipts, other than sales commissions, derived from its sale of money orders on the leased premises. Moreover, Cloverland contends that the gross receipts from lottery ticket sales, other than earned commissions, are "trust funds" which it possesses only temporarily as the State's agent and thus these monies are totally different than those generated by its sale of goods upon the leased premises. Cloverland further suggests that in no event can

its lottery ticket activity be deemed to constitute a "sale" but rather is a part of a State-controlled gambling activity where only a "chance" to win a prize is purchased from the licensed agent.

Fry maintains, as the trial court held, that it is not relevant that the parties did not specifically contemplate lottery sales when the lease was drafted. He argues that since the percentage rental provision applies unambiguously to "sales of every kind made in the store on the leased premises," the plain meaning of the clause includes lottery ticket sales. Fry points out that the objective theory of contracts is applied in Maryland and limits the court to the "four corners" of the contract in determining the intention of the parties. He relies upon our cases, including *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 368, 137 A.2d 687 (1958), which held that "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding, or unless there is fraud, duress, or mutual mistake." Fry argues that the "gross sales" provision of the lease applies to all sales on the leased premises, irrespective of who the seller may be, whether a trustee, agent, consignee, or otherwise. It is where the sale is made, Fry suggests, that is the determinative factor. As to the express deduction from "gross sales" of money orders sold on the leased premises, Fry says that no other exclusion is authorized in the lease and, consequently, lottery sales are included.

### III.

In *Food Fair Stores v. Blumberg*, 234 Md. 521, 533, 200 A.2d 166 (1964), we observed:

"Although percentage leases are generally governed by the rules of law applicable to ordinary leases, the peculiar features of provisions making rental dependent in some way upon the percentage of income from, or gross sales

of, business on the leased premises frequently present difficult questions of construction, which render such leases in the nature of agreements *sui generis.*"

We find no ambiguity in the language of the lease in this case. As we stated in *Kasten Constr. v. Rod Enterprises*, 268 Md. 318, 301 A.2d 12 (1973), in applying the objective test for interpreting contracts where, as here, the language of a contract is not ambiguous, "the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." 268 Md. at 329, 301 A.2d 12. *See also Feick v. Thrutchley*, 322 Md. 111, 586 A.2d 3 (1991), and cases therein cited.

In applying the objective theory of contracts to the lease now before us, we recognize that Cloverland agreed to pay a specified percentage of its gross sales "of every kind" made on the leased premises as additional rent. We think reasonable persons in the position of the parties would have thought that the additional rental percentage clause encompassed the sale of any and all items, not expressly excluded, which Cloverland would sell in its store in the course of its business activities. It was reasonable that the parties would view the percentage rental provision of the lease as applying to the gross amount of its sales—amounts which Cloverland was entitled to retain as its own property. We think that the parties would reasonably have recognized that monies produced by Cloverland from its sale of lottery tickets, other than sales commissions, did not belong to Cloverland, but were held only temporarily by it. In these circumstances, it was reasonable that the parties would recognize that Cloverland's activities as a licensed sales agent for the State in the sale of lottery tickets produced for it only commission revenues limited by law. In effect, Cloverland sold its services to the State in return for these sales commissions and it is only that amount that is subject to the percentage rental clause of the lease. Indeed, the reasonableness of that understanding is fortified by the treatment afforded by the lease to money order sales by

Cloverland, which included only commissions as a part of "gross sales," thus recognizing that Cloverland was in reality selling a service in return for commissions.

Generally supportive of our conclusion in this case is *Anest v. Bellino,* 151 Ill.App.3d 818, 104 Ill.Dec. 861, 864, 503 N.E.2d 576, 579, *cert. denied,* 114 Ill.2d 543, 108 Ill.Dec. 414, 508 N.E.2d 725 (1987). There, the court held that the term "gross sales," as used in a restaurant lease to determine the amount of additional percentage rent due, did not include the gross receipts realized from sales of lottery tickets but only the five percent commission which the restaurant actually received for its service. The court reasoned that the money received from the sale of lottery tickets, minus the amount retained by the lottery agent, only temporarily comes into the possession of the lottery agent but is not its property; it concluded that "amounts which are not income to a lessee are not received by him within the meaning of gross sales." 104 Ill.Dec. at 865, 503 N.E.2d at 580.

We, therefore, determine in this case that Cloverland's sale of lottery tickets constituted a sale of its service to the State, for which it received a commission, and that only those amounts are includable within the "gross sales" formulation of the lease for purposes of applying the additional rental percentage provisions of the lease.[1]

---

**1.** By chs. 315 and 316 of the Acts of 1988, effective July 1, 1988, and now codified as Code (1990 Cum.Supp.) § 9–117(c) of the State Government Article, it is now provided:

"(c) *Rental payments.*—Unless otherwise expressly provided by a lease for premises on which lottery tickets are sold, whenever lottery tickets are sold by a licensed agent on premises subject to rent that is wholly or partially based on a percentage of gross sales or receipts, the tenant responsible for payment of the rent may calculate that portion of the rent arising from the sale of lottery tickets solely on the basis of:

(1) the commission received by the licensed agent on the sale of those tickets; and

(2) in the case of instant lottery tickets, the difference between the price paid by the licensed agent in purchasing the tickets from the Agency and the price for which they were sold by the agent."

JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED, EXCEPT AS TO THE SUM OF $2,603.00 INVOLVING NON–LOTTERY TICKET SALES, AS TO WHICH THE JUDGMENT FOR THIS AMOUNT, WITH INTEREST FROM THE DATE OF JUDGMENT IS AFFIRMED; CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR ENTRY OF A DECLARATORY JUDGMENT CONSIST-ENT WITH THIS OPINION.  COSTS IN THE CIRCUIT COURT AND IN THIS COURT TO BE PAID NINE–TENTHS BY THE APPELLEE AND ONE–TENTH BY THE APPELLANT.