In re the CIRCLE K CORPORATION, Debtor.

Frank F. COLLINS, Appellant,

v.

The CIRCLE K CORPORATION, Appellee.

BAP No. AZ–94–1271–MeRJ.
Bankruptcy No. 90–5052 PHX–GBN.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Submitted without Oral Argument Sept. 28, 1994.

Decided March 16, 1995.

Leslie Ann Haacke, Phoenix, AZ, for appellant.

Susan F. Austin, El Paso, TX, for appellee.

Before MEYERS, RUSSELL and JONES, Bankruptcy Judges.

## OPINION

MEYERS, Bankruptcy Judge:

### I

The issue here is whether, in calculating the percentage rent it must pay under a lease agreement, The Circle K Corporation ("Circle K") should include two percent of the commissions received from the sale of lottery tickets or two percent of the gross receipts from the lottery tickets.

We hold that the lease agreement provides for the latter calculation. Therefore, we **REVERSE.**

### II

### FACTS

On August 4, 1975, Circle K, as lessee, entered into a twenty-year lease agreement with Frank Collins ("Collins"), as lessor, of a store in Phoenix, Arizona. The lease pro-

vides that rent would be a minimum of $750 per month for the first five years, with the monthly rent to increase $50 every five years. Paragraph A of the lease provides:

> In addition to the minimum rent, Lessee shall pay annually as hereinafter provided as additional rent, the amount, if by which two percent (2%) of Lessee's "gross sales" (as hereinafter defined) exceeds the guaranteed minimum annual rent plus the sum of the real estate taxes and insurance premiums on the leased premises for such year. Said additional rent is hereinafter referred to as "percentage rent".

Paragraph C states:

> The term "gross sales" as used in this Lease shall include gross receipts of every kind and nature originating from sales and services on the demised premises, whether on credit or for cash, in every department operating on the demised premises, whether operated by the Lessee, or by a Sublessee, or concessionaire excepting therefrom any rebates and/or refunds to customers, refundable deposits on beverage bottles, telephone tolls, gasoline sales, money order transactions, the transfer or exchange of merchandise between the stores of Lessee if any, where such transfers or exchanges are made solely for the convenient operation of the business of Lessee and not for the purpose of consummating a sale which has theretofore been made on the demised premises or for the purpose of depriving Lessor of the benefit of a sale, and the amount of any sales, privilege license, excise or other taxes on transactions collected and/or paid either directly or indirectly by Lessee to any government or governmental agency.

In July 1981, lottery ticket sales by the State of Arizona became legal and the State began selling lottery tickets, mostly through retail stores.

On August 7, 1981, Circle K sent a letter to Collins. The letter stated that Circle K wished to sell Arizona State lottery tickets in Collins' store, provided that Collins would agree to exempt any commissions and computations of sales of lottery tickets from the calculation of his percentage rent due under the lease agreement. The letter left a space indicating where Collins was to sign and date his waiver to the additional percentage rents. The letter further stated that Circle K's decision to sell lottery tickets in Collins' store would depend on his response thereto. Collins did not sign or return the letter. Circle K started selling lottery tickets from the store within a few weeks of the date the letter was sent.

Collins allegedly called Tom Cosgrove ("Cosgrove"), Property Management Department Supervisor for Circle K. Collins had dealt with Cosgrove in the past concerning his lease, property taxes, annual accounting statements and other issues. Cosgrove purportedly told Collins that if Arizona lottery tickets were being sold in Collins' store and Collins had not waived his right to the percentage rents under the lease, Collins "would be taken care of."

The annual accounting statements of percentage rents due Collins, which were provided to him by Circle K, showed only the calculation of two percent of "gross sales" and did not reflect a separate categorization for the sale of lottery tickets.

Circle K filed a Chapter 11 bankruptcy petition in 1990.

In 1992, Collins allegedly learned for the first time that he was not receiving two percent of the price of the lottery tickets, and tried to resolve the matter with Circle K. After settlement negotiations failed, on March 19, 1993, Circle K filed a motion to assume the lease with Collins. Collins objected to the motion and the bankruptcy court conducted an evidentiary hearing concerning the amount Circle K owed under the lease agreement.

The court issued an order on February 17, 1994, determining that Collins was entitled to only two percent of the commissions received by Circle K from the State of Arizona. Collins appealed from this order.

## III

### STANDARD OF REVIEW

Although interpretation of a contract involves mixed questions of fact and law, the application of contractual principles

is a matter of law subject to *de novo* review. *In re Dominguez,* 995 F.2d 883, 885 (9th Cir.1993); *In re Growers–Ranchers, Ltd.,* 110 B.R. 915, 916 (9th Cir. BAP 1990), *aff'd* 945 F.2d 1145 (9th Cir.1991). The interpretation of state law also is subject to *de novo* review. *In re Dominguez, supra,* 995 F.2d at 885.

## IV

## DISCUSSION

■ Collins points out that the lease provides that he is entitled to two percent of the gross sales, broadly defined to "include gross receipts of every kind and nature originating from sales and services on the demised premises," excepting specific transactions such as gasoline sales and money order transactions. The lease does not exclude from the calculation of gross sales the receipts originating from sales of lottery tickets, so it seems clear that lottery tickets are included in the broadly defined calculation of gross sales.

Circle K contends that the absence of any reference to lottery sales in the lease, combined with the itemization of many types of transactions excluded from percentage rent and the fact that the lease was executed six years before legalization of lottery tickets sales in Arizona, all support a conclusion that Circle K and Collins did not have a common understanding as to the treatment of lottery ticket sales for purposes of percentage rent.

The circumstances show otherwise. First, it is true that the lease did not refer to lottery sales in the lease. However, it also did not refer to sales of magazines, milk, soft drinks and many other items which Circle K likely sells. The fact that certain items were specifically excluded from the calculation of gross sales, and lottery tickets were not so excluded, indicates that the parties knew how to except certain items and did not choose to exclude lottery tickets. Second, although the lottery was not legal in Arizona until years after the lease was executed, when it did become legal Circle K informed Collins in writing that it would sell lottery tickets if Collins agreed to exclude the receipts from the gross sales calculation. Collins declined

to do so. Therefore, it seems that the parties did have a common understanding about the treatment of lottery ticket sales, but Circle K violated that understanding. Also, Cosgrove allegedly told Collins that he "would be taken care of" by Circle K. Although an accountant for Circle K testified that in most of the stores leased by Circle K, only the commissions received from the sale of lottery tickets were included in the determination of gross sales, this evidence sheds little light on the specific agreement with Collins.

The court stated in its oral findings: "Obviously, the majority of the money raised by lottery sales is property of the State of Arizona. The seller of lottery tickets has no right and clearly holds the proceeds under a trust." The court reasoned that Circle K sold its services to the State of Arizona in return for a commission, and therefore only that amount would be considered in calculating gross sales. The bankruptcy court followed the analysis in *Cloverland Farms Dairy, Inc. v. Fry,* 322 Md. 367, 587 A.2d 527 (1991) and *Anest v. Bellino,* 151 Ill.App.3d 818, 104 Ill.Dec. 861, 503 N.E.2d 576 (1987). It rejected the decision of *McComb v. McComb,* 9 Mich.App. 70, 155 N.W.2d 860 (1967).

The lease provisions in the *Cloverland Farms* case were similar to those in the instant one. The lease provided for percentage rent based on "gross sales made in the store" and provided: "In computing sales for the purpose of this provision, Lessee shall take the total amount of sales of every kind made in the store on the leased premises and deduct therefrom the following . . .: (1) refunds made to customers, (2) sales, excise and gross receipts taxes, and (3) proceeds from sale of money orders (fee received for issuance of money orders shall not be deducted)." *Cloverland Farms Dairy, supra,* 587 A.2d at 528. Like the instant case, when the *Cloverland Farms* lease was executed, the sale of lottery tickets was illegal in Maryland. Three years later, the State authorized the sale of lottery tickets and allowed the selling agents to retain a commission from the sales. *Id.*

The court in *Cloverland Farms* viewed the percentage rental provision of the lease as applying to the amounts which the tenant was entitled to retain as its own property. 587 A.2d at 530. It noted that monies produced from the tenant's sale of lottery tickets, other than sales commissions, did not belong to the tenant, but were held only temporarily by it. *Id.* The court held that in effect, the tenant sold its services to the State in return for the sales commissions and only that amount was subject to the percentage rental clause of the lease. *Id.* The court stated that this interpretation was reasonable, given the treatment afforded by the lease to money order sales by the tenant, which included only commissions as a part of gross sales. *Id.*

The court in *Anest v. Bellino, supra,* used similar reasoning. It stated that although the tenant actually handled the lottery ticket receipts, that portion of the money belonging to the lottery system was not intended by the parties to be included in gross sales. 104 Ill.Dec. at 864, 503 N.E.2d at 579. The court concluded that only the commission paid to the tenant should be applied in calculating gross sales. *Id.*

In *McComb v. McComb, supra,* 155 N.W.2d at 861, the term "gross sales" was defined in the lease agreement as: "The entire amount of the actual sales price, whether for cash or otherwise, of all sales of merchandise, service and other receipts whatsoever, of all business conducted in or from the premises ... and sales by any sublessee, concessionaire or licensee on the premises," but excluding a pastry shop on the premises which was a sublessee. In that case, the dispute over what constituted gross sales involved that portion of the money paid for traveler's checks sold in the store which could be considered "gross sales." 155 N.W.2d at 862. The court noted that the lease was "quite expansive," as it included in gross sales "other receipts whatsoever." *Id.* The court recognized that sales conducted at

a pastry shop which subleased a portion of the premises were specifically excluded from gross sales. *Id.* It held that the entire traveler's check receipts were includible in "gross sales" under the lease agreement. 155 N.W.2d at 863.

We believe the court erred in following *Cloverland Farms* and *Anest* and rejecting *McComb.* If the lease meant to exempt receipts from those items "held in trust" by Circle K, then there would have been no need to specifically exempt money order receipts from the determination of gross sales. Furthermore, we have uncovered no authority providing that receipts from Arizona lottery ticket sales are deemed trust funds.[1]

The Dissent would except lottery ticket receipts from the calculation of gross sales on the ground that the receipts are property of the State. We find this fact immaterial to our analysis, because the lease between Collins and Circle K did not differentiate between merchandise sold by Circle K as owner and merchandise sold by Circle K as agent for the owner.[2] Instead, the lease broadly defined "gross sales" to include "gross receipts of every kind and nature originating from sales and services on the demised premises...."

Although Circle K's ultimate returns on the lottery ticket sales are only a percentage of the price of the lottery tickets, this is true for all items it sells. Whether the lottery ticket receipts are viewed as originating from Circle K's sales or from Circle K's services, they should be included in the lease agreement's broad definition of gross sales.

## V

## CONCLUSION

We interpret the lease agreement to provide that in calculating percentage rents, Collins is entitled to include two percent of the receipts from lottery ticket sales.

**REVERSED.**

---

1. Neither the Arizona statutes concerning the State lottery, A.R.S. § 5–501 et seq., nor the rules and regulations of the Arizona State Lottery Commission, A.C.R.R. R4–37–101 et seq., specifically provide as such, although A.C.R.R. R4–37–206 and 207 require retailers to pay over lottery sales receipts, net of commissions and prize winnings paid out, to the lottery commission.

2. We note also that Circle K chose to sell the lottery tickets. Our analysis might be different if, for example, a governmental entity had required Circle K to sell lottery tickets in order to be licensed to conduct business.

JONES, Bankruptcy Judge, dissenting:

I respectfully dissent because I disagree with the majority's choice to reject the logic of *Cloverland Farms* and *Bellino*, two recent cases which specifically addressed facts similar to the instant appeal, while following the reasoning of *McComb*, a 27 year old case concerning the sale of traveler's checks in which the appellate court did not "fully agree" with the trial court's finding, but affirmed it as "not clearly erroneous." *McComb*, 155 N.W.2d at 863.

*Cloverland Farms* and *Bellino* held that only the commissions received by lottery ticket sellers are included in "gross receipts." The determinative factor for both courts was ownership of the lottery receipts. Because lottery ticket sellers were merely agents of the State, *Cloverland Farms*, 587 A.2d at 528, the lottery receipts were never the property of the seller. *Id.* at 530; *Bellino*, 104 Ill.Dec. at 865, 503 N.E.2d at 580. The same is true of the Arizona lottery scheme. *See* Ariz.Rev.Stat.Ann. § 5–512 (1994) (lottery ticket sellers are licensed agents of the state); Ariz.Rev.Stat.Ann. § 42–1310.01 (1994) (exempting lottery receipts from a retail store's gross sales for tax purposes); Ariz.Comp.Admin.R. & Regs. R4–37–206 and R4–37–207 (1994) (requiring turnover of lottery receipts to the State).

The majority is sidetracked by the bankruptcy court's conclusion that the lottery ticket revenue was "held in trust" by Circle K. Whether or not the Arizona statutory scheme refers to lottery revenue in the hands of ticket sellers as trust funds is not dispositive of the issue. The reality is that lottery receipts are at all times property of the State in the hands of its agent.

For the foregoing reasons, I respectfully **dissent**.