In re The CIRCLE K CORPORATION, Debtor.

The CIRCLE K CORPORATION, Appellant,

v.

Frank F. COLLINS, Appellee.

No. 95–15789.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 18, 1996.

Decided Oct. 17, 1996.

Lawrence G. Scarborough, Kelly A. O'Connor, and Chad H. Kolodisner, Brown & Bain, P.A., Phoenix, AZ, for appellant.

Joseph M. Huey, Huey & Winski, Phoenix, AZ, for appellee.

David D. Dodge, Lieberman, Dodge, Sendrow & Gerding, Phoenix, AZ, for amicus.

Before: CHOY, CANBY and FERNANDEZ, Circuit Judges.

CANBY, Circuit Judge:

Circle K Corporation leased property from landowner Frank Collins, agreeing to pay rent calculated at two percent of "gross sales" on the premises, with certain specified exceptions. After the lease was in effect, Arizona authorized a state lottery and Circle K became one of its sales agents. The lease made no mention of lottery receipts. The question for decision here is whether Collins is entitled to two percent of total lottery ticket sales, or only two percent of Circle K's commission on those sales. We conclude that Collins is entitled only to two percent of Circle K's commissions.

## BACKGROUND

This case arose in bankruptcy court, where Circle K is a Chapter 11 debtor. In 1975, Circle K leased property from Collins for twenty years, for the operation of a convenience store located in Phoenix, Arizona. The lease provided for a minimum base rent. In addition, it provided for a "percentage rent" in the following terms:

Lessee shall pay annually as hereinafter provided as additional rent, the amount, if any, by which two percent (2%) of Lessee's "gross sales" (as hereinafter defined) exceeds the guaranteed minimal annual rent plus the sum of the real estate taxes and insurance premiums on the leased premiums for such year. Said additional rent is hereinafter referred to as "percentage rent."

The lease defined "gross sales" as follows:

Gross receipts of every kind and nature originating from sales and services on the demised premises, whether on credit or for cash, in every department operating on the demised premises, whether operated by the Lessee, or by a Sublessee, or concessionaire excepting therefrom any rebates and/or refunds to customers, refundable deposits on beverage bottles, telephone tolls, gasoline sales, money order transactions, the transfer or exchange of merchandise between the stores of Lessee if any, ... and the amount of any sales, privilege license, excise or other taxes on transactions collected and/or paid either directly or indirectly by Lessee to any government or governmental agency.

When Circle K and Collins entered into their lease, lotteries were illegal in Arizona. In July 1991, Arizona passed the Arizona State Lottery Act, Ariz.Rev.Stat.Ann. §§ 5-502 to -525 (1995), instituting the Arizona Lottery.

In August, 1981, Circle K sent a letter to Collins, advising him that Circle K wished to sell lottery tickets at the store located on Collins' property. At the bottom of the letter was a place for Collins to sign the following statement:

I, _____, the Lessor (or agent for same) do hereby accept and agree to allow participation in the Arizona Lottery by the Circle K Corporation upon and from the property/ies leased from me. I further agree to exempt and exclude any commissions and computation of sales of Arizona

Lottery tickets from the calculation of any percentage rentals.

Collins did not sign this letter or return it to Circle K. Circle K nevertheless began selling lottery tickets at the store within two weeks. When Collins learned that Circle K was selling lottery tickets, he called Tom Cosgrove, a Circle K Property Management Department Supervisor. According to Collins, Cosgrove told Collins that he would "be taken care of." In fact, Circle K did not pay Collins any percentage rate based on the lottery ticket sales. Collins was unaware of this omission because the percentage rent payments did not reflect specific categories of sales.

In 1990, Circle K filed for Chapter 11 protection in the United States Bankruptcy Court for the District of Arizona. Circle K filed a motion to assume the Collins lease, and Collins objected. The bankruptcy court held a hearing to determine the amount owed under the lease. The bankruptcy court ruled that Circle K owed percentage rent on lottery sales, but that the rent was to be two percent of Circle K's commission on lottery ticket sales, rather than two percent of the total sale price of lottery tickets. In the bankruptcy court's view, the lottery proceeds were property of the State when received, and did not represent gross receipts of Circle K. Circle K sold its services to the State for a commission, and that commission provided the appropriate percentage rent base.

Collins appealed, and the Bankruptcy Appellate Panel reversed, finding that Collins was entitled to a percentage rent based on the total sales of the lottery tickets. Judge Jones dissented, following the reasoning of the bankruptcy court. Circle K appealed the Bankruptcy Appellate Panel's decision. This Court has jurisdiction pursuant to 28 U.S.C. § 158(d) (1993).

## ANALYSIS

■ This case requires us to interpret a contract. Although contract interpretation involves mixed questions of law and fact, the application of contractual principles is a mat-

ter of law. *In re Dominguez,* 995 F.2d 883, 885 (9th Cir.1993). We review de novo the Bankruptcy Appellate Panel's legal conclusions and application of state law. *In re Johnston,* 21 F.3d 323, 326 (9th Cir.1994).

■ It is a close question whether the Collins lease provides for percentage rent of two percent of Circle K's commissions from lottery sales, or two percent of total ticket sales price. We conclude, however, that the bankruptcy court's view is the correct one: percentage rent should be calculated only on the commissions. The parties have made comparisons to other types of receipts covered or not covered by the terms of the lease, but in our view state-sponsored lottery ticket sales fall into a class by themselves. They are quite unlike the general run of commercial operations mentioned in the lease. The State of Arizona has made Circle K one of its sales agents. *See* Ariz.Rev.Stat. § 5–512(A); Ariz.Comp.Admin.R. & Regs. R19–3–201. State regulations require Circle K to pay over to the state its total proceeds from sales, less commissions and prizes awarded. Ariz.Comp.Admin.R. & Regs. R19–3–206, 207. The commission rate was originally five percent of ticket sales, and is now six percent.

In the hands of the State, lottery proceeds are used for various public purposes in the manner of tax revenues.[1] In its ticket sales, Circle K acts more nearly as a tax collector for the State than as a retailer. It sells chances and takes custody of receipts, in which it has no interest beyond its commission, and remits them to the State. It is paid for its services by commission, and that commission is properly considered a "gross receipt[ ]" from "services" performed on the premises. We do not, however, interpret the lease as reaching the total funds received for the State in its calculation of percentage rent.

The only two cases squarely in point agree with this interpretation of similar leases. In *Cloverland Farms Dairy, Inc. v. Fry,* 322

---

1. Lottery ticket receipts are also not considered part of the retailer's receipts for sales and other tax purposes. Ariz.Rev.Stat.Ann. § 42–1310.01(A)(20)(1991). We do not rely on this fact in reaching our conclusion, because the State may have its own reasons for not taxing such receipts that do not bear on the proper interpretation of the lease.

Md. 367, 587 A.2d 527 (1991), the Maryland Court of Appeals dealt with a lease, entered before Maryland authorized its lottery, that contained a clause as broad as the one before us. The lease provided for a percentage rent on "gross sales made in the store." *Id.* 587 A.2d at 528. It also provided that in computing "gross sales," the lessee was to

> take the total amount of sales of every kind made in the store and deduct therefrom the following, to the extent that same are included in such total amount: (1) refunds made to customers, (2) sales, excise and gross receipts taxes, and (3) proceeds from sale of money orders (fee received for issuance of money orders shall not be deducted).

*Id.* Despite this broad language, the Court held that gross lottery sales did not fall within the percentage rent clause. The Court recognized that reasonable persons "would have thought that the additional rental percentage clause encompassed the sale of any and all items, not expressly excluded, which Cloverland would sell in its store *in the course of its business activities.*" *Id.* at 530 (emphasis added). Lottery sales did not fall in that category. The Court further stated:

> In effect, Cloverland sold its services to the State in return for these sales commissions and it is only that amount that is subject to the percentage clause of the lease. Indeed, the reasonableness of that understanding is fortified by the treatment afforded by the lease to money order sales by Cloverland, which included only commissions as part of "gross sales," thus recognizing that Cloverland was in reality selling a service in return for commissions.

*Id.*[2]

The Maryland Court in *Cloverland* relied in part on the only other case cited to us that dealt with the same issue, *Anest v. Bellino,* 151 Ill.App.3d 818, 104 Ill.Dec. 861, 503 N.E.2d 576 (1987). *Anest* held that gross lottery sales did not fall within a percentage rental clause applying to "all gross sales."

*Id.* 104 Ill.Dec. at 862, 503 N.E.2d at 577. The Court stated:

> Although the restaurant actually handled the money, that portion of the money belonging to the lottery system was not intended by the parties to be included in gross sales. Only the commissions and bonuses belong to the restaurant, and only those amounts increase the restaurant's sales.

*Id.* 104 Ill.Dec. at 864, 503 N.E.2d at 579.

Arizona has no decisions in point, but we have no reason to believe that its courts would diverge from these two decisions that are the only ones to have dealt with the lottery issue in connection with percentage rent clauses. The same factors that led Maryland's and Illinois' courts to exclude total lottery sales exist in this case. The money collected by Circle K, except for commissions, belongs to the State. Lottery sales were not part of the Circle K's regular business in the reasonable contemplation of the parties at the time the lease was entered into; they are in a class by themselves. If the parties had foreseen the future legalization of lottery sales, and had addressed the question specifically in the lease, the nature of other exceptions suggests that total proceeds other than commissions would have been excluded from "gross sales." The arguably-comparable activity of money order transactions was so excluded, as were receipts from refundable deposits on beverage bottles, and sales taxes that Circle K collected but transferred to the State. Thus the same kinds of considerations that led to the decisions in *Cloverland* and *Anest* are present here.

We also cannot distinguish *Cloverland* and *Anest* from the present case on the basis of the breadth of their percentage rent clauses. Surely *Cloverland*'s reference to "the total amount of sales of every kind made in the store," *Cloverland,* 587 A.2d at 528, is no narrower in scope than Circle K's "gross receipts of any kind and nature originating from sales and services on the demised

---

2. The Maryland Court indicated in a final footnote that the Maryland legislature in 1988 had passed a statute providing that gross lottery sales did not fall within lease clauses like that in issue.

*Cloverland,* 587 A.2d at 531 n. 1. The Court did not rely on the statute in reaching its decision, however, nor could it have; the statute was enacted after the lease in issue was entered.

premises." It is true that Circle K's clause also applies to such sales or services whether the department in question is "operated by the Lessee, or by a Sublessee, or concessionaire," but that language does not serve to turn the entire proceeds of lottery ticket sales into "gross receipts from sales or services" within the meaning of the lease definition. The State of Arizona is not a sublessee operating a department on the premises; it is an off-premises principal to whom Circle K has sold its on-premises services. The additional clause therefore does not distinguish this case from *Cloverland* or *Anest.*

The majority of the Bankruptcy Appellate Panel disagreed with the bankruptcy trial judge as well as *Cloverland* and *Anest* because it saw no relevance in the fact that the total lottery receipts were not the property of Circle K. The Panel stated that, if proceeds held for others were not to be included in "gross sales," then there would have been no need to exclude money order transactions from that definition. The exclusion, however, can be as much an indication of the parties' view that such receipts are not properly part of "gross sales" as that they are. Money order receipts share with lottery ticket sales the characteristic that the gross proceeds are likely to be disproportionately large, and the commission disproportionately small, in comparison to the sales price and profit margin on general types of merchandise clearly subject to the percentage rent clause.[3] The exclusion of money order receipts may simply be an attempt to avoid litigation like this to establish that such proceeds are not covered. Nor can we infer from the failure expressly to exclude lottery proceeds that they were intended to be included in "gross sales." Lotteries were illegal when the lease was entered; reasonable parties in the position of Circle K and Collins

would not have thought it necessary to exclude such receipts.

We do not agree with the majority of the Bankruptcy Appellate Panel that the intent of the parties to include gross lottery sales in the percentage rent clause can be gleaned from the letter that Circle K sent to Collins, or by the telephone conversation between Collins and an employee of Circle K. The letter asked Collins to agree to exclude the ticket sales *and* commissions from the percentage rent, and the telephone call resulted in the Circle K employee's telling Collins that he would "be taken care of." The bankruptcy trial judge found that these facts evidenced only an understanding that lottery sales would have *some* effect on the percentage rent, not that they showed an intent to include the total lottery sales in the percentage base. This fact finding, which was the only one that the trial court made on the basis of the extrinsic evidence, was not clearly erroneous.

Finally, we do not find persuasive the decision relied upon by the majority of the Bankruptcy Appellate Panel, *McComb v. McComb*, 9 Mich.App. 70, 155 N.W.2d 860 (1967). *McComb* held that the entire amount of travelers' check receipts were includable as gross sales for purposes of a percentage rent clause. *Id.* 155 N.W.2d at 863. Whether or not *McComb* was correct with regard to travelers' checks, the issue of lottery sales is quite distinguishable. In our case, as in *Cloverland* and *Anest*, lotteries were criminal activity at the time the leases were entered, and it is quite understandable that the parties did not deal with the issue specifically in the lease. The same cannot be said for travelers' checks.[4] Furthermore, in *McComb* the court merely held that the trial court had not clearly erred in its finding that gross sales included the total sales receipts from

---

**3.** Circle K asserts that the six percent commission does not cover the cost of the lottery sales, and that the incentive to sell lottery tickets is to bring into the store customers who will make other purchases that benefit both Circle K and Collins. We do not depend on this assertion in making our ruling, because we recognize that the percentage rent clause is based on gross receipts, not net profits.

**4.** For similar reasons, we do not find persuasive the case of *County of Contra Costa v. Pacific States Aviation, Inc.*, 273 Cal.App.2d 497, 78 Cal.Rptr. 320 (1969), submitted as supplemental authority by Collins. *Pacific States* held that total receipts from car rentals were subject to a "gross receipts" percentage rent clause. The court also pointed out that "gross receipts" may have different meanings in a lease and in a tax statute, a proposition with which we do not disagree. See note 1, *supra.*

travellers' checks. The only factual finding made by the trial court here was that the parties intended *some* revenue from lottery sales to be included in percentage rent; the question whether total sales or commissions should constitute the base was decided as a question of law. We review that ruling of the Bankruptcy Appellate Panel de novo, not for clear error. Accordingly, we find *McComb* not to be helpful in reaching our decision in this case.

### CONCLUSION

We conclude that the term "gross sales" in the percentage rent term of the lease agreement did not include the total sales price of state lottery tickets. "Gross sales" included only the commissions that Circle K received in exchange for its services in selling the tickets. The Bankruptcy Appellate Panel's decision is therefore

**REVERSED.**

FERNANDEZ, Circuit Judge, dissenting:

I respectfully dissent. I would not attempt to guess what the parties might have done had the possibility of a new good or service (for example a new drink or the Arizona Lottery) been brought to their attention in 1975 when they entered into their lease. I see no reason to do so.

Circle K drew the lease, which specifically and clearly provides that Collins is entitled to rent based upon two percent of gross sales, if that exceeds the minimum. "Gross sales" in turn means "gross receipts of every kind and nature originating from sales and services on the demised premises . . . in every department operating on the demised premises, whether operated by the Lessee, or by a Sublessee, or concessionaire. . . ."

I see nothing which makes that language hard to fathom, and if I did think it was ambiguous, I would be inclined to construe the ambiguity against the draftsman of the document, Circle K. *See Cardon v. Cotton Lane Holdings, Inc.,* 173 Ariz. 203, 841 P.2d 198, 202 (1992); *Polk v. Koerner,* 111 Ariz. 493, 533 P.2d 660, 662 (1975). Certainly, when a customer buys a lottery ticket Circle K has supplied a sale or a service. Certain-

ly, that has taken place on the demised premises. Certainly, the money which passes into Circle K's hands at that time is a "gross receipt of [some] kind and nature." Equally certainly, Circle K should calculate Collins' percentage on that amount.

Circle K's convoluted attempts to avoid the pellucid result of its own pellucid language should not be countenanced. It concedes that the commissions it received for selling the lottery tickets on the premises should be considered. Presumably it finally sees that those are receipts originating from a sale or service on the premises. But so, too, are the rest of the lottery ticket proceeds. Indeed, there is no proper way to distinguish between the two.

Circle K's explanation that the rest of the proceeds should be excluded because they belong to the Lottery is much more difficult to fathom than the words of the lease itself. Receipts by a concessionaire would belong to the concessionaire, not to Circle K. Yet we know that Circle K would be required to add an amount equal to those receipts into its own receipts when it made the percentage rent calculation. Neither am I impressed by claims that if Circle K must pay the percentage rent, public policy will be outraged or someone might be entitled to seize Arizona's money. The most important public policy ought to be that companies like Circle K abide by their lease agreements, not that gambling tickets be sold. Furthermore, the mere fact that the percentage rent is measured by the receipts does not mean that the receipts belong to Circle K itself. They could be the receipts of a sublessee or a concessionaire or someone else. The lease does not apply to Circle K's receipts; it applies to receipts "originating from sales and services on the demised premises." It does not matter whose receipts they are. What counts is the place they accrue, not the person to whom they accrue.

Circle K can pay Collins his percentage rent or it can, as it promised or threatened in its letter of August 7, 1981, decide not "to continue in this program at [his] store." What it cannot do is openly violate the express terms of the lease; that is to say, it

cannot do so unless we say it can. We should not.

Thus, I respectfully dissent.