**HARTIG DRUG COMPANY, Appellant,**

v.

**Kenneth HARTIG, Appellee.**

**In the Estate of Kenneth F. Hartig, Deceased, Bob Smith, Executor.**

**No. 98–481.**

Supreme Court of Iowa.

Nov. 17, 1999.

Rehearing Denied Dec. 9, 1999.

Brendan T. Quann and Davin C. Curtiss of O'Connor & Thomas, P.C., Dubuque, for appellant.

Mark J. Sullivan of Reynolds & Kenline, L.L.P., Dubuque, for appellee.

Considered by McGIVERIN, C.J., and LARSON, CARTER, CADY, and ANDREASEN,* JJ.

CADY, Justice.

This appeal requires us to determine whether the rent due from a retail business tenant under a percentage of "gross sales" lease includes the total sale of lottery tickets and postage stamps. We conclude the lease excludes total lottery and stamp sales, and reverse and remand the district court ruling.

## I. Background Facts and Proceedings.

Hartig Drug Company is a third generation family business which owns and operates several retail pharmacy businesses in the Dubuque area. The company is owned by Richard Hartig, who purchased the stock in the company in 1984 from a trust established at the time of his father's death in 1973. Richard began working for the business in 1964.

---

* Senior judge assigned by order pursuant to Iowa Code section 602.9206 (1999).

Kenneth Hartig, Richard's brother, was vice president of the company until Richard acquired the stock. Kenneth began working for the business in 1955. Under the 1984 stock purchase agreement negotiated between Richard and Kenneth, Kenneth acquired ownership of the land and buildings which housed the drug stores. Kenneth was required under the agreement to lease the buildings to Hartig Drug.

The lease for the drug store located on Central Avenue in Dubuque set a minimum monthly base rental amount of $3208.33, which could be increased to 2.75 percent of the "gross sales" of the business of the store if the percentage exceeded the amount of the base monthly rent. The lease included a broad definition of "gross sales" for the calculation of any additional rent. It defined "gross sales" to mean "the aggregate of all retail sales of every kind, type, and description, and services performed for patrons made in, upon, or from the demised premises by the tenant or by any sublessee, licensee, concessionaire, other occupant...."

The purpose of the percentage lease provision was to give Kenneth a stake in the success of Hartig Drug's business. The base rent amount of $3208.33 represented 2.75 percent of the gross sales in the year prior to the lease. At the end of every year, Kenneth had the right to inspect Hartig Drug records to ensure the proper amount of rent was paid. At his option, these records could also be reviewed by an independent accountant.

After the lease was entered into, two events occurred which led to the present lawsuit. First, Hartig Drug negotiated a contract with the United States Postal Service in 1985 to establish the Hartig Drug store on Central Avenue as a USPS substation. Under this contract, Hartig Drug furnished its customers a number of services offered by the USPS, including the sale of stamps and money orders. The USPS provided Hartig Drug with scales, a money order imprinter, forms and supplies, stamps, envelopes, and other items necessary to conduct the postal sales. Under the terms of the contract, all USPS sales and services purchased at Hartig Drug were paid directly to the USPS. Furthermore, Hartig Drug was not allowed to commingle Hartig Drug money with USPS money. USPS revenues were processed separately and deposited daily with the USPS. All title to USPS stamps and services remained in the USPS. Under the contract, Hartig Drug was also required to staff the postal substation. In exchange for this, the USPS paid Hartig Drug $5000 per year between the years of 1985 and 1993, and $9000 per year from 1994 on to help defray the costs of operating the postal substation. Hartig Drug received no other revenues from the USPS substation. Hartig Drug excluded the total postal sales as well as the money received from the USPS in calculating the percentage lease rent. Over the years, the total sale of stamps and other postal services exceeded 2.3 million dollars.

The second event occurred in the latter part of 1985 after the State of Iowa authorized a state regulated lottery. At this time, Hartig Drug began selling lottery scratch tickets and lotto drawing tickets for the state. The state paid Hartig Drug a five percent commission for every ticket it sold. Between the years of 1985 and 1994, Hartig Drug received $32,435.29 in commissions for the lottery sales it made for the state. It stopped selling lottery tickets in 1994. In addition to the general commissions received, Hartig Drug also received a ten percent bonus for the sale of a $100,000 winning ticket. The total of commissions received for lottery sales was $42,435.29. The total lottery sales were $634,714. Like the stamp sales, neither the lottery sales nor the commissions were included in the percentage lease rental calculation.

In 1996, Hartig Drug filed a petition for declaratory judgment. It sought to compel Kenneth to make certain repairs and provide general maintenance at the build-

ing leased by Hartig Drug. Kenneth filed a counter-claim alleging unpaid rent based upon the exclusion of lottery ticket and postage sales from additional rent calculations under the lease agreement. Kenneth died during the pendency of the lawsuit, and his estate was made a party to the proceedings.

Following a bench trial, but prior to the district court's judgment, Kenneth's estate agreed to make the repairs sought by Hartig Drug. This left only the estate's claim for rent. The district court found the percentage rent calculation should have included the total sale of all lottery tickets and stamps, and entered judgment for the estate in the amount of $128,075.95, with statutory interest, as payment for rent due under the percentage lease agreement. Hartig Drug appeals.

## II. Scope of Review.

We generally review the construction and interpretation of a contract as a matter of law. Thus, we are not bound by the construction or interpretation made by the trial court. *Krause v. Krause*, 589 N.W.2d 721, 724 (Iowa 1999). However, if the interpretation was predicated upon extrinsic evidence, the findings of the trial court are binding on appeal if supported by substantial evidence. *See Modern Piping, Inc. v. Blackhawk Auto. Sprinklers, Inc.*, 581 N.W.2d 616, 623 (Iowa 1998); *Connie's Constr. Co. v. Fireman's Fund Ins. Co.*, 227 N.W.2d 207, 210 (Iowa 1975). Yet, when no relevant extrinsic evidence exists, the resolution of any ambiguity in a written contract is a matter of law for the court. *See* 17A Am.Jur.2d *Contracts* § 339, at 346 (1991). The question whether an ambiguity exists is also one of law. *Id.*

## III. Discussion.

A cardinal rule of contract construction or interpretation is the intent of the parties must control. *Whalen v. Connelly*, 545 N.W.2d 284, 291 (Iowa 1996). The important time frame for determining this intent is the time the contract was executed. *Davenport Osteopathic Hosp. Ass'n v. Hospital Serv., Inc.*, 261 Iowa 247, 260, 154 N.W.2d 153, 161 (1967). If the contract is ambiguous and uncertain, extrinsic evidence can be considered to help determine the intent. Yet, a contract is not ambiguous merely because the parties disagree over its meaning. *Tom Riley Law Firm, P.C. v. Tang*, 521 N.W.2d 758, 759 (Iowa App.1994). Instead, an ambiguity occurs in a contract when a genuine uncertainty exists concerning which of two reasonable interpretations is proper. *Berryhill v. Hatt*, 428 N.W.2d 647, 654 (Iowa 1988). The existence of an ambiguity, however, can be determined only after all pertinent rules of interpretation have been considered. *Id.* Our general rules of interpretation are used both to determine what meanings are reasonably possible as well as to choose among two reasonable meanings. Restatement (Second) of Contracts § 202 cmt. a (1981).

The trial court determined the phrase "all retail sales" was clear and unambiguous and bound Hartig Drug to pay the percentage rent on every sale without limitation. It found the plain meaning of "all retail sales" had no exclusions, and it was prohibited from judicially creating an exception merely because a particular type of sale may not be profitable. Thus, it concluded the total lottery ticket and stamp sales were intended to be included in "gross sales."

While the trial court properly focused on the language of the lease, it failed to further consider the rules of interpretation in reaching its conclusion. We find the application of the rules of interpretation to the face of the lease shows the parties intended to exclude transactions such as lottery and stamp sales from the definition of "gross sales."

In interpreting contracts, we give effect to the language of the entire contract according to its commonly accepted and ordinary meaning. *Magina v.*

*Bartlett,* 582 N.W.2d 159, 163 (Iowa 1998). Moreover, particular words and phrases are not interpreted in isolation. *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents,* 471 N.W.2d 859, 863 (Iowa 1991). Instead, they are interpreted in a context in which they are used. *Home Fed. Sav. & Loan Ass'n v. Campney,* 357 N.W.2d 613, 617 (Iowa 1984). Furthermore, the words are given the meaning at the time the contract was executed. 17A Am. Jur.2d *Contracts* § 359, at 382. Using these principles as a guide, we find the only reasonable interpretation of the lease excluded the total sale of lottery tickets and stamps in calculating the additional rent obligation.

At the time the lease was executed in this case, the drug store did not maintain a postal substation and the State of Iowa had no lottery. Thus, the term "retail sales" did not specifically consider postage stamps and lottery sales. However, in the context of a retail business lease, there are a host of characteristics of lottery and postage stamp sales which distinguish the transactions from the types of "retail sales" of the drug store the parties would have reasonably contemplated at the time of the lease. These distinctions are so significant that reasonable parties to a percentage-of-sales lease would not have intended to include lottery and stamp sales.

■ Unlike the typical commercial transaction in a retail business, a business which sells lottery tickets is simply a licensee of the state. *See generally* Iowa Code ch. 99E (1995). Similarly, a retail business with a postal substation is an agent for the postal service. In both instances, the business is carefully regulated by the government, and is required to turn over the proceeds of the sales. The state pays the business a five percent commission on each lottery ticket that is sold, while the postal service pays an annual fee for the operation of a postal substation. Unlike the customary retail sales of a drug store, the amount of lottery tickets and stamps sold have no or little direct relationship to the amount of business revenues. A reasonable business tenant would not agree to pay additional rent based on sales that belonged to the government. These characteristics reveal substantial differences from ordinary retail sales, and places lottery and stamp sales in a separate class by themselves. *See In re Circle K Corp.,* 98 F.3d 484, 486 (9th Cir.1996). Thus, the common and ordinary meaning of "retail sales" in the context of a percentage-of-sales business lease would exclude transactions such as lottery and stamp sales.

Additionally, the rule of interpretation providing that the intention of the parties is not derived from a single phrase or clause, but from the contract as a whole is also pertinent to the resolution of this case. Under other provisions of the lease in this case, "gross sales" specifically excluded sums collected for taxes. A retail business collects taxes imposed by the government upon certain retail sales and is required to remit the taxes to the taxing agency. This lease provision excluding taxes reveals the parties intended to exclude that portion of sales the business did not actually retain because it was required to remit the amount to the government.

This exclusion is important in interpreting the contract because lottery sales are used for the public welfare, not unlike tax revenues. *See generally* Iowa Code ch. 99E. Similarly, the cost of stamps helps finance the government postal service. Thus, by transferring the lottery and stamp sales to the government, a business acts more like a tax collector than a retailer. *Circle K,* 98 F.3d at 486. This exclusion, read in light of the nature of lottery and stamp sales, illustrates the parties would have excluded lottery and stamp sales from "gross sales" if they would have been specifically considered at the time the lease was executed.

These considerations, and others, have caused other jurisdictions faced with the interpretation of similar leases to conclude that the term "gross sales" does not include total sales of lottery tickets. In

*Anest v. Bellino,* 151 Ill.App.3d 818, 104 Ill.Dec. 861, 503 N.E.2d 576 (1987), the appellate court of Illinois was faced with the identical issue presented in this case. *Anest,* 104 Ill.Dec. 861, 503 N.E.2d at 577. In excluding lottery sales from the term "all gross sales" in a restaurant lease, the court reasoned,

> While gross sales have no relation to profit ... amounts which are not income to a lessee are not received by him within the meaning of gross sales. The money received from the sale of lottery tickets ... temporarily come[s] into the possession of the [lessee], but are not his property.

*Id.* at 579–80. The court held "[a]lthough the restaurant actually handled the money, that portion of the money belonging to the lottery system was not intended by the parties to be included in gross sales." *Id.* at 579. The court only included the commissions and bonuses received by the business from the state for the service it provided in selling tickets on behalf of the state lottery. *Id.*

In *Cloverland Farms Dairy, Inc. v. Fry,* 322 Md. 367, 587 A.2d 527 (1991), the court of appeals of Maryland found the phrase "the total amount of sales of every kind made in the store" unambiguously excluded the sale of lottery tickets. *Cloverland,* 587 A.2d at 527. Applying an objective test of ambiguity, the court found a reasonable person in the position of the parties to the contract would not include an additional rent percentage clause based on sales which the business did not retain. *Id.* at 530. Instead, it found the clause encompassed sales which occurred in the course of its business activity. *Id.*

Finally, in *Circle K,* the Ninth Circuit Court of Appeals found "state-sponsored lottery ticket sales fall into a class by themselves." *Circle K,* 98 F.3d at 486. Sellers are "paid for its services by a commission, and that commission is properly considered a 'gross receipt[ ]' from 'services' performed on the premises." *Id.* In relying upon *Anest* and *Cloverland,*

the court held even the extremely broad definition of "gross sales," as "gross receipts of any kind and nature originating from sales and services on the demised premises" were included regardless of whether the sale was "by the Lessee, or by a Sublessee, or concessionaire," did not serve to turn the entire proceeds of lottery ticket sales into receipts within the meaning of the lease. *Id.* at 487–88. Thus, the money received on the *sale* of the tickets was not to be included in the additional rent calculation, only the commissions received for the *service* of selling the tickets. *Id.* at 489.

We agree with the district court that the percentage rent terms include lottery and stamp sales, but not the total amount of the sale. Instead, we find the reasoning of the *Anest, Cloverland,* and *Circle K* courts persuasive. "Retail sales" under the lease contemplates revenues actually received by Hartig Drug. The lease did not contemplate the inclusion of proceeds which did not belong to the business, and was not considered as part of its income. Nevertheless, "gross sales" under the lease did include "services performed for patrons." Hartig Drug acknowledges the lottery and stamp sales were a service for customers, and the revenues it received for performing those services is properly included within the definition of "gross sales." We therefore reverse the district court and remand for entry of judgment for the additional rent based upon the actual commissions received for lottery tickets and the actual compensation received from the postal service for the sale of stamps.

**REVERSED AND REMANDED.**