# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1933

_____

|  |  |  |
|---|---|---|
| In re: Acceptance Insurance Companies Inc., | * | |
| | * | |
| Debtor. | * | |
| | * | |
| _____ | * | |
| | * | |
| Granite Reinsurance Company, Ltd., | * | |
| a Barbados Corporation, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | Bankruptcy Appellate Panel |
| v. | * | for the Eighth Circuit. |
| | * | |
| Acceptance Insurance Company, | * | |
| a Nebraska Corporation, | * | |
| | * | |
| Appellant, | * | |
| _____ | * | |
| | * | |
| Acceptance Insurance Companies Inc., | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Granite Reinsurance Company, Ltd., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: October 17, 2008
Filed:  May 18, 2009

_____

Before RILEY, BOWMAN, and COLLOTON, Circuit Judges.
_____

RILEY, Circuit Judge.

This matter involves the interpretation of the terms of a reinsurance contract and the duties of the parties under that contract. Appellants Acceptance Insurance Companies Inc. (AICI) and Acceptance Insurance Company (AIC) appeal from the Bankruptcy Appellate Panel's (BAP) judgment affirming in part, and reversing in part, a prior decision of the bankruptcy court regarding the reinsurance contract. We affirm the judgment of the BAP.

## I.    BACKGROUND
### A.    Factual Background

AICI, a Delaware corporation, is an insurance holding company with its principal place of business in Iowa. AICI is the parent company of American Growers Insurance Company (American Growers), AIC, and American Agrisurance (AmAg). American Growers was a Nebraska corporation in the business of writing crop insurance, primarily multi-peril crop insurance (MPCI). AIC is a Nebraska corporation with its principal place of business in Iowa. AIC was in the business of property and casualty insurance and occasionally fronted some MPCI in states where American Growers was not licensed to do business. AmAg was the managing general agent for American Growers.

Goran Capital Inc. (Goran Capital), a Canadian company, is the parent company of Granite Reinsurance Company, Ltd. (Granite Re) and IGF Insurance Company (IGF). Granite Re, a Barbados company with its principal place of business in Bermuda, is in the reinsurance business. Granite Re was a reinsurer of IGF, an Iowa-based company in the business of writing insurance, including crop insurance and MPCI.

MPCI is a type of crop insurance that insures against all perils, except for those specifically excluded, and is available through a government-sponsored program. MPCI is written by private insurance companies that are approved by and reinsured by the Federal Crop Insurance Corporation (FCIC). The Risk Management Agency (RMA) oversees the FCIC and the MPCI program. To sell MPCI, an insurance company must be approved to do so by the RMA and must be party to a Standard Reinsurance Agreement (SRA) with the FCIC. Reinsurance is "[i]nsurance of all or part of one insurer's risk by a second insurer, who accepts the risk in exchange for a . . . premium." Black's Law Dictionary 1312 (8th ed. 2004).

From 1999 to 2000, IGF incurred $39 million in losses, and as a result, Goran Capital decided to sell IGF's assets. Alan Symons (Symons), the former chief executive officer (CEO) of Goran Capital and vice president of Granite Re, approached John Martin (Martin), the president and CEO of AICI and AIC, to discuss a potential sale. On May 23, 2001, AICI, AIC, American Growers, and AmAg (collectively, AICI entities) entered into an Asset Purchase Agreement (APA) with Goran Capital, Symons International Group, Inc., IGF, and IGF Holdings, Inc. Pursuant to the APA, the AICI entities agreed to purchase various IGF assets (IGF Transaction). American Growers acquired IGF's crop insurance assets; AIC acquired certain of IGF's fixed assets, including computers, some software, and leases on equipment; and AmAg acquired certain marketing assets and trademarks of IGF, and the employees who were transferred as part of the APA.

The APA identified several ancillary agreements which the parties anticipated entering into as part of the IGF Transaction. One such ancillary agreement was a Multi-Peril Crop Insurance Stop Loss Reinsurance Contract (Reinsurance Contract). The Reinsurance Contract was entered into by Granite Re and AICI on June 6, 2001. AICI was referred to in the Reinsurance Contract as the "Company," and "Company" was defined "to include any and/or all of the subsidiary companies which are or may hereafter come under the management of the Company." The Reinsurance Contract stated it would "become effective as of July 1, 2000 and shall remain in full force and

-3-

effect with respect to all Covered Business risks in force or attaching from that date through June 30, 2005."

The purpose of the Reinsurance Contract was for Granite Re to provide reinsurance coverage to the AICI entities which wrote MPCI policies or purchased IGF's MPCI policies. In addition to providing reinsurance, the Reinsurance Contract was intended to satisfy a requirement of the FCIC. To gain FCIC approval of the IGF Transaction, the AICI entities were required to have reinsurance in the event their losses exceeded 100% of the premium. Under the terms of the Reinsurance Contract, Granite Re agreed to "be liable for 100% of the subject ultimate net loss in excess of . . . 140%, but not greater than 150%, of the [AICI entities'] subject net retained premium income for each crop year."[1] The Reinsurance Contract defined the term "subject ultimate net loss" as "the subject net retained premium on business the subject of this Contract, classified by the Company as MPCI." The Reinsurance Contract did not define the term "subject net retained premium." The Reinsurance Contract did, however, define the term "subject net retained premium income" as "the net retained premium on Covered Business the subject of this Contract, classified by the Company as MPCI." "Net retained premium income" was defined as the "gross premium income on Covered Business, less cessions to the FCIC's Assigned Risk, Developmental and Commercial Funds." Finally, the Reinsurance Contract provided "[t]he liability of [Granite Re] for the term of the treaty shall not exceed $40,000,000 in all without the payment of additional premium."[2]

---

[1]Alan Symons explained a stop loss contract in more simplistic terms, testifying the Reinsurance Contract "stop[ped] the loss for [the AICI entities] at 140 percent and Granite Re then t[ook] over at 140 percent and g[ot] off at 150 percent."

[2]The Reinsurance Contract contained an additional provision, not relevant to this appeal, whereby Granite Re agreed to be jointly and severally liable with IGF in an amount up to $9 million in the event any third parties asserted liabilities against the AICI entities as successors to IGF under the APA.

In exchange for Granite Re agreeing to provide reinsurance to the AICI entities at the 140% to 150% layer, the AICI entities agreed to "pay [Granite Re] a minimum deposit premium of $6,000,000 at the signing of this treaty for the crop year 2001 and 2002 and [] a minimum deposit premium of $3,000,000 on January 1, 2003, a minimum deposit of $3,000,000 on January 1, 2004 and a minimum deposit of $3,000,000 on January 1, 2005." The Reinsurance Contract did not contain an early termination provision. On June 2, 2001, AICI paid Granite Re the initial $6 million deposit premium, but neither AICI nor its subsidiaries ever paid Granite Re the remaining deposits.

American Growers incurred significant losses in 2000 due to multiple years of drought. On November 22, 2002, the director of the Nebraska Department of Insurance (NDOI) placed American Growers in supervision and prohibited American Growers from writing further insurance, concluding there was "reasonable cause to believe that American Growers [wa]s in hazardous financial condition" as defined by Nebraska regulations. On February 28, 2005, the NDOI placed American Growers in statutory liquidation. The NDOI also placed AIC in supervision on December 20, 2002; however, AIC was not placed in receivership. AIC discontinued writing insurance after 2001, other than a small amount of crop insurance fronted in 2002.

## B.    Procedural Background

On January 7, 2005, AICI filed a Chapter 11 petition in the United States Bankruptcy Court for the District of Nebraska (bankruptcy court). Granite Re filed a proof of claim in the bankruptcy court on May 4, 2005, claiming AICI owed Granite Re $10,875,363 for the unpaid premium deposits due under the Reinsurance Contract plus interest.

On September 22, 2005, Granite Re filed a complaint against AIC in the United States District Court for the District of Nebraska, claiming AIC breached the Reinsurance Contract by failing to pay the remaining $9 million in premium. On January 23, 2006, the district court granted Granite Re and AIC's joint motion to refer

-5-

the district court matter to the bankruptcy court because the matter was related to the bankruptcy proceeding. The bankruptcy court then granted the parties' joint motion to consolidate Granite Re's claims against AIC with Granite Re's proof of claim.

On October 26, 2006, AICI filed a complaint against Granite Re in the bankruptcy court, asserting the Reinsurance Contract lacked consideration, and therefore, AICI claimed, under various theories, that AICI was entitled to the return of the initial $6 million premium payment it made in June 2001. AICI also objected to Granite Re's proof of claim, asserting various theories why AICI was entitled to disallowance of Granite Re's claim.

AICI and AIC filed motions for summary judgment in the bankruptcy court. AICI and AIC argued: (1) AIC was not a party to the Reinsurance Contract, (2) the Reinsurance Contract lacked consideration, (3) the AICI entities' duties under the Reinsurance Contract were discharged due to frustration of purpose, and (4) Granite Re had been unjustly enriched by retaining the initial $6 million premium deposit. The bankruptcy court denied the motions for summary judgment and set the matter for trial.

On February 27 and 28, 2007, the bankruptcy court conducted a consolidated trial of Granite Re's proof of claim, Granite Re's claim against AIC, and AICI's complaint against Granite Re. Symons testified on behalf of Granite Re, and Martin testified on behalf of the AICI entities. Each party also presented expert testimony. Jens Juul (Juul) testified as an expert for Granite Re, and James Brost testified as an expert for the AICI entities. On May 9, 2007, the bankruptcy court issued an order dismissing both adversary proceedings and denying Granite Re's proof of claim. The bankruptcy court made the following findings: (1) AICI, AIC, American Growers, and Granite Re were all parties to the Reinsurance Contract, (2) the Reinsurance Contract provided reinsurance as intended, (3) the Reinsurance Contract provided coverage for a maximum term of five years, but AICI no longer needed coverage after 2002, (4) Granite Re was entitled to retain the initial $6 million premium, and (5) Granite Re

was not entitled to payment of the premium deposits that were due in 2003, 2004, and 2005.

Granite Re appealed the bankruptcy court's dismissal of Granite Re's claim against AIC and the denial of Granite Re's proof of claim against AICI to the BAP. AICI cross-appealed, challenging the bankruptcy court's denial of AICI's summary judgment motion and denial of its claim against Granite Re. On March 12, 2008, the BAP issued an order and judgments, affirming in part, and reversing in part, the bankruptcy court. The BAP affirmed the following findings of the bankruptcy court: (1) AIC was a party to the Reinsurance Contract, as a subsidiary of AICI, (2) the Reinsurance Contract was supported by consideration, and (3) Granite Re was entitled to retain the initial $6 million premium deposit. The BAP reversed the bankruptcy court's finding Granite Re was not entitled to the premium payments due in 2003, 2004, and 2005, and determined Granite Re was entitled to the $9 million in unpaid premium deposits. The BAP next found the bankruptcy court's denials of the AICI entities' summary judgment motions were unreviewable due to the intervening trial on the merits. Finally, the BAP found neither the losses sustained by American Growers nor the NDOI's supervision of American Growers frustrated the purpose of the Reinsurance Contract.

AICI and AIC (collectively, Appellants) appeal the BAP's order and judgments, arguing the BAP erred in finding: (1) the Reinsurance Contract was supported by consideration, (2) AIC was a party to the Reinsurance Contract, (3) Granite Re was entitled to payment of the premium deposits due in 2003, 2004, and 2005, (4) the purpose of the Reinsurance Contract was not frustrated and the AICI entities were not entitled to be discharged from their payment obligations, and (5) Granite Re was entitled to retain the initial $6 million premium deposit.

## II.  DISCUSSION

### A.  Standard of Review

"'In an appeal from the BAP, this court sits as a second court of review, reviewing [the bankruptcy court's] findings of fact for clear error and [its] conclusions of law de novo.'" In re Western Iowa Limestone, Inc., 538 F.3d 858, 862 (8th Cir. 2008) (quoting Capital One Auto Fin. v. Osborn, 515 F.3d 817, 821 (8th Cir. 2008)). "As the second court to review the bankruptcy court's factual findings, our independent review gives deference to the BAP's conclusions." In re Zepecki, 277 F.3d 1041, 1045 (8th Cir. 2002) (per curiam) (citation omitted). "[W]e review the bankruptcy court's interpretation of a contract de novo." Tri-State Financial, LLC v. First Dakota Nat'l Bank, 538 F.3d 920, 924 (8th Cir. 2008) (citation omitted). We may affirm the bankruptcy court on any ground supported by the record. See In re Bridge Information Systems, Inc., 460 F.3d 1041, 1047 (8th Cir. 2006) (citing Gralike v. Cook, 191 F.3d 911, 921 n.9 (8th Cir. 1999)). The Reinsurance Contract specifies, and the parties agree, Iowa law governs all matters arising under the Reinsurance Contract.

### B.  Acceptance Insurance Company (AIC)

Appellants first claim the BAP erred in finding AIC was a party to the Reinsurance Contract. Appellants contend: (1) AIC was not mentioned in the Reinsurance Contract, (2) AIC did not intend to be a party to the Reinsurance Contract, and (3) AIC did not ratify the signature of Martin, AICI's representative. We dispose of Appellants' first contention easily. The Reinsurance Contract stated AICI would be "referred to as the 'Company'" throughout the document. On the next line, the Reinsurance Contract provided, "Wherever the word 'Company' is used in this Contract, such term shall be held to include *any and/or all of the subsidiary companies* which are or may hereafter come under the management of the Company." (emphasis added). Appellants do not dispute AIC is a wholly owned subsidiary of AICI. Thus it is beyond dispute AIC was not only "mentioned" unambiguously in the Reinsurance Contract, but also repeatedly referred to wherever the term "Company" appeared.

Appellants next assert neither AICI nor AIC intended AIC to be a party to the Reinsurance Contract. Martin, president and CEO of AICI and AIC, testified at trial he executed the Reinsurance Contract on behalf of AICI and had no authority to execute the Reinsurance Contract on behalf of AIC. Martin also testified, at the time of execution, he anticipated only AICI and American Growers would benefit under the Reinsurance Contract "[b]ecause all the crop reinsurance risk was housed at American Growers." Martin's testimony actually supports a conclusion AIC was a party to the Reinsurance Contract, because like AIC, nowhere in the Reinsurance Contract, did AICI indicate it was executing the Reinsurance Contract on behalf of American Growers. The language of the Reinsurance Contract makes no distinction between AICI, AIC, or any other subsidiaries of AICI. We find Appellants' after-the-fact oral explanations of intent at the time of execution cannot trump the unambiguous language of the Reinsurance Contract, which states, "[t]he *Company* will pay [Granite Re]" the scheduled premium deposits in exchange for Granite Re providing reinsurance at the 140-150% layer "of the *Company's* subject net retained premium income for each crop year." (emphasis added). See Tom Riley Law Firm, P.C. v. Tang, 521 N.W.2d 758, 759 (Iowa Ct. App. 1994) (citation omitted) ("[I]ntent is determined by the language in the contract, unless it is ambiguous.").

Appellants also maintain AIC was not a party to the Reinsurance Contract because AIC did not ratify Martin's signature. On June 4, 2001, two days before the Reinsurance Contract was executed, AIC's board of directors, including Martin, adopted various resolutions and signed a written consent. The written consent stated,

> RESOLVED, that the Asset Purchase Agreement . . ., each of the Ancillary Agreements (as defined in the Purchase Agreement) and related agreements, the performance by AIC of its obligations under the Purchase Agreement, each of the Ancillary Agreements and the related agreements and the consummation by AIC of the transactions contemplated by the Purchase Agreement, *each of the Ancillary Agreements and related agreements is hereby ratified, approved, authorized and adopted*; and

FURTHER RESOLVED, that [AICI] and each of the officers designated by it and each of the President, Chief Financial Officer and Chief Administrative Officer of AIC and any other officer of AIC designated by the President of AIC . . . *is hereby empowered, directed and authorized to execute and deliver in the name of AIC, the Purchase Agreement, each of the Ancillary Agreements*, related agreements and all other required agreements. . . .

FURTHER RESOLVED, that each of the Authorized Officers *may take any and all actions as may, in his opinion, be necessary, appropriate, convenient or desirable to consummate the transactions contemplated by the Purchase Agreement, the Ancillary Agreements and related agreements or to implement the intent and purpose of the foregoing resolutions and the signing or execution . . . of any instrument . . . that [the Authorized Officer] deems . . . to be necessary, appropriate, convenient or desirable*; and

FURTHER RESOLVED, that all of the acts and deeds of each of the Authorized Officers in connection with the negotiation, execution and delivery of the Purchase Agreement, the Ancillary Agreements and the related agreements and any related documents to carry out the intent and purposes of the foregoing resolutions are *hereby authorized[,] adopted, ratified, confirmed and approved as the acts and deeds of AIC [in] all respects as if such resolutions had been adopted prior to taking such action.* (emphasis added).

The parties agree the Reinsurance Contract was one of the "ancillary agreements" contemplated by the APA. Based upon the broad language of the written consent authorizing the execution of the ancillary agreements and the unambiguous language in the Reinsurance Contract, we conclude AIC was a party to the Reinsurance Contract.

## C. Consideration

Appellants next claim the BAP erred in finding the Reinsurance Contract was supported by consideration. Appellants contend, based upon the definitions of the terms used in the Reinsurance Contract, Granite Re's obligation under the Reinsurance Contract was illusory. Appellants also assert "the BAP literally re-wrote the [Reinsurance Contract] to create consideration where there was none," despite the fact the Reinsurance Contract contained unambiguous language and Granite Re did not make a claim for reformation.

The Reinsurance Contract provided Granite Re "shall be liable for 100% of the subject ultimate net loss in excess of . . . 140%, but not greater than 150%, of the Company's subject net retained premium income for each crop year." The Reinsurance Contract defined the term "subject ultimate net loss" as "the subject net retained premium on business the subject of this Contract, classified by the Company as MPCI." The Reinsurance Contract does not define the term "subject net retained premium." The Reinsurance Contract defined "subject net retained premium *income,*" as "the net retained premium on Covered Business the subject of this Contract, classified by the Company as MPCI." Appellants insist, based on the definitions of "subject ultimate net loss" and "subject net retained premium *income*," there was no circumstance under which Granite Re would be required to provide reinsurance. According to Appellants, this is so "because the term 'covered loss' is equated with 'premium,' which means the 'covered loss' never would exceed premium such that the 'subject ultimate net loss' never could exceed 140%."

The bankruptcy court found the Reinsurance Contract provided reinsurance coverage as intended by the parties and as required by the FCIC. The bankruptcy court reasoned the FCIC would not have approved the IGF Transaction, which provided for the purchase of IGF's MPCI policies, unless Appellants' MPCI policies were reinsured at a particular loss level. The bankruptcy court did not specify whether it found the language in the reinsurance provision ambiguous; however, it is clear the

-11-

bankruptcy court considered extrinsic evidence in making its findings. The bankruptcy judge stated, "I accept the opinion of the expert witness for Granite Re based upon his experience in the industry, his understanding of the language used in reinsurance contracts, and the intent of the parties to the contract." The bankruptcy court found the term "subject ultimate net loss" in the Reinsurance Contract meant "the ultimate net loss on business which is the subject of the contract."

The BAP affirmed the bankruptcy court, determining when the Reinsurance Contract was considered in its entirety, "it [wa]s clear that the parties intended the contract to provide . . . coverage at the 140% to 150% loss level," and "[n]either party intended the contract provide no coverage." The BAP noted the definition of the term "subject ultimate net loss" was "confusing," but concluded the confusion was "the result of careless drafting rather than an intent by the parties to create a meaningless contract." The BAP speculated, "The parties most likely meant to define 'subject ultimate net loss' as 'the *ultimate net loss* on business the subject of this Contract.'" The BAP so concluded, because it "doubt[ed] that the parties intended 'subject ultimate net loss' and 'subject net retained premium' to have virtually identical definitions, especially because the plain meaning of the words 'net loss' and 'net retained' are antonymic." Although the BAP expressly determined the Reinsurance Contract was unambiguous on its face and there was no need to look to extrinsic evidence, the BAP noted testimony from representatives of both AICI and Granite Re revealed the parties intended the Reinsurance Contract to provide reinsurance coverage. Finally, the BAP reasoned Appellants "could not have intended the contract to lack enforceability or it would have been in violation of federal crop insurance regulations which require reinsurance coverage."

We review de novo the bankruptcy court's interpretation of the Reinsurance Contract. See Tri-State Financial, 538 F.3d at 924. "Insurance policies are contracts between the insurer and the insured and must be interpreted like other contracts, the object being to ascertain the intent of the parties." Talen v. Employers Mut. Cas. Co.,

703 N.W.2d 395, 407 (Iowa 2005) (citation omitted).  We are concerned only with the intent of the parties at the time they executed the contract.  See Hartig Drug Co. v. Hartig, 602 N.W.2d 794, 797 (Iowa 1999).  "[I]ntent is determined by the language in the contract, unless [the language] is ambiguous."  Tom Riley, 521 N.W.2d at 759 (citation omitted).  If the language of the contract is ambiguous or uncertain, we may consider extrinsic evidence to determine the parties' intent.  See Hartig, 602 N.W.2d at 797.  "[A]n ambiguity occurs in a contract when a genuine uncertainty exists concerning which of two reasonable interpretations is proper."  Id. (citation omitted).  Whether an ambiguity exists in contract language is a question of law.  Id.  "Because a contract is to be interpreted as a whole, it is assumed in the first instance that no part of it is superfluous; an interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."  Iowa Fuel & Minerals v. Iowa State Bd. of Regents, 471 N.W.2d 859, 863 (Iowa 1991) (citation omitted).

Unlike the BAP, we conclude the language in the reinsurance provision of the Reinsurance Contract was ambiguous and uncertain.  See Hartig, 602 N.W.2d at 797.  Our conclusion is based on the fact the term "subject ultimate net loss" is defined as "subject net retained premium on business the subject of this Contract," which, on its face, is not identical to the term "subject net retained premium *income*."  The Reinsurance Contract failed to define the term "subject retained premium," and at oral argument, counsel for Appellants was not able to explain the significance of the difference, if any, between the terms "subject net retained premium" and "subject net retained premium *income*."  We conclude the reinsurance provision is susceptible to two alternate interpretations—either the language of the Reinsurance Contract required Granite Re to provide reinsurance at the 140% to 150% layer in exchange for a premium, or it did not.  Thus, like the bankruptcy court, we believe consideration of extrinsic evidence is both appropriate and necessary to interpret the language of the reinsurance provision and to ascertain the intent of the parties.

-13-

At trial before the bankruptcy judge, Appellants and Granite Re each presented expert testimony. Juul testified on behalf of Granite Re. Juul has been in the insurance business since 1973. Juul founded and served as president of Scandinavian Reinsurance Company, which provided reinsurance coverage in twenty-two countries and did business with Fortune 500 corporations. Juul's insurance company also wrote MPCI reinsurance. Juul is a certified arbitrator under the ARIAS, an international reinsurance and insurance arbitration society. To be certified in this society, one must be recommended by a minimum of four other certified arbitrators and attend conferences and workshops. Juul testified as an expert witness in three prior insurance disputes. Juul stated his opinion that while the reinsurance provision in the Reinsurance Contract was "badly drafted," the Reinsurance Contract provided for reinsurance coverage at the 140% to 150% layer. Juul declared, "any arbitration panel or any other expert witness would not have gotten hung up on a sloppy wording, but would have understood" the Reinsurance Contract provided for reinsurance coverage. Juul suggested Appellants' expert, Brost, was "grasping at the straw extraordinarily far from reach" by suggesting the Reinsurance Contract did not provide reinsurance based on the terms and definitions.

Brost testified on behalf of Appellants. Brost worked for Cooper Gay Intermediaries, LLC, a reinsurance intermediary. A reinsurance intermediary, or insurance broker, interacts between reinsurers and companies looking to purchase reinsurance. Before this position, Brost had been in the crop reinsurance business since about 1976 or 1977. Brost estimated he had been involved personally in a thousand reinsurance contracts. On the question of whether the Reinsurance Contract provided reinsurance, Brost opined, "the representation that there was reinsurance for that layer of 10 percent between 140 and 150 does not exist." Brost testified, "if the losses mean the premium, there's no way that the losses can ever exceed the premium to 140 percent," and thus, Brost maintained there was no circumstance under which reinsurance would ever be payable under the Reinsurance Contract.

Having reviewed the trial testimony of both Juul and Brost, we cannot say the bankruptcy court clearly erred in accepting the testimony of Juul as to the effect of the ambiguous language in the Reinsurance Contract. See Stevenson v. Union Pac. Ry. Co., 354 F.3d 739, 745 (8th Cir. 2004) (citation omitted) (stating it is the finder of fact's province to determine the credibility of both lay and expert witnesses). We give great deference to the bankruptcy court's factual findings when those "findings call for an assessment of witness credibility." In re Hixon, 387 F.3d 695, 700 (8th Cir. 2004) (citation omitted). We agree with both the bankruptcy court and the BAP that the parties intended the Reinsurance Contract to provide reinsurance coverage. The fact the provision of reinsurance was necessary for the parties to gain FCIC approval for the IGF Transaction, and the parties obtained FCIC approval based on the language in the Reinsurance Contract, further supports this conclusion. We conclude the bankruptcy court did not err in finding the Reinsurance Contract was supported by consideration.

### D.    Premium Payments

Having found the Reinsurance Contract provided reinsurance coverage as intended by the parties, we next address Appellants' argument the BAP erred in finding Granite Re was entitled to the full $15 million premium because the Reinsurance Contract had a fixed five-year term and made no provision for early termination. Appellants claim they were not required to pay the $3 million premium deposits due on January 1 of 2003, 2004, and 2005, because the NDOI placed American Growers in receivership and prohibited American Growers from writing any insurance after November 2002.

The Reinsurance Contract provides: "This Contract shall become effective as of July 1, 2000 and shall remain in full force and effect . . . from that date through June 30, 2005." The Reinsurance Contract further provided, in pertinent part: "The liability of the Reinsurer for the term of the treaty shall not exceed $40,000,000 in all." With regard to the premium, the Reinsurance Contract required Appellants to

pay Granite Re "a minimum and deposit premium of $6,000,000 at the signing of this treaty for the crop year 2001 and 2002 and [] a minimum deposit premium of $3,000,000 on January 1, 2003, a minimum deposit of $3,000,000 on January 1, 2004 and a minimum deposit of $3,000,000 on January 1, 2005." The Reinsurance Contract made no provision for early termination.

The bankruptcy court considered the term and premium provisions of the Reinsurance Contract and a letter Symons wrote to the Indiana Department of Insurance (IDOI) on behalf of IGF. In the letter, Symons explained the terms of the Reinsurance Contract and wrote: "[Granite Re] will be paid $3,000,000 per year for the duration of the risk. [Five year maximum]." The bankruptcy court found as follows:

> Since the insurance risk being covered by the reinsurer is an annual risk limited to any particular crop year, neither the Acceptance Companies nor Granite Re would have any risk in those years in which crop insurance was not in force. Neither [American Growers] nor AIC sold or put in place any multi-peril crop insurance for the crop years 2003, 2004, and 2005. No premiums were due for those years because no risk of loss was reinsured for those years.

The BAP reversed the bankruptcy court, determining neither the "term" provision nor the "premium" provision were ambiguous. The BAP declared, "The contract does not indicate that the installment payments are yearly renewal premiums or that the debtor may opt out of the contract to avoid paying any of the installments." The BAP explained the Reinsurance Contract provided a cumulative $40 million in reinsurance coverage over the five-year term, rather than providing $40 million in coverage per year. While the BAP determined there was no need to resort to extrinsic evidence because the language was unambiguous, the BAP noted Symons also wrote in the letter to the IDOI, "[Granite Re] will reinsure $40 million of risk for MPCI layer

-16-

140% to 150% for five years." The BAP found the letter, when read in its entirety, supported its conclusion Granite Re was entitled to the full $15 million premium.

Reviewing the bankruptcy court's decision de novo, we agree with the BAP. We need look no further than the language of the Reinsurance Contract to reach this conclusion. While the Reinsurance Contract permitted Appellants to pay the $15 million premium in deposit payments on specified dates, the Contract had a definite term of five years from July 1, 2000, to June 30, 2005, with a definite liability limit of $40 million over those five years. The Reinsurance Contract had no provision for early termination; thus, this was not a renewable contract where Appellants had the option to terminate after one year or two years. The parties unequivocally agreed to five years of reinsurance coverage up to a cumulative $40 million. Additionally, the Reinsurance Contract explicitly states the payments due on January 1 of 2003, 2004, and 2005 were only *minimum* deposits. This further convinces us Appellants are incorrect in their assertion that Appellants were only required to pay the 2003, 2004, and 2005 deposits if American Growers were writing insurance during those years. We need not consider extrinsic evidence, such as Symons's letter to the IDOI (although the Symons letter supports our view), to reach this conclusion because the Reinsurance Contract's language is unambiguous on this point. See Tom Riley, 521 N.W.2d at 759.

### E.    Frustration of Fundamental Purpose

Finally, Appellants contend the BAP erred in finding the fundamental purpose of the Reinsurance Contract was not frustrated when the NDOI placed American Growers in supervision and statutory liquidation and ordered American Growers to stop writing insurance in November 2002. Appellants claim "a year of unprecedented flooding and a 100-year drought of a severity not seen since the 1930s" led to unforeseeable losses, and any duty Appellants had under the Reinsurance Contract was discharged when the NDOI prohibited American Growers from writing MPCI.

Iowa courts have adopted the reasoning of Restatement (Second) of Contracts § 265, which states:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

See Mel Frank Tool & Supply, Inc. v. Di-Chem Co., 580 N.W.2d 802, 806, 807 (Iowa 1998) (quoting Restatement (Second) of Contracts § 265). A party may not be discharged of its duty under a contract due to frustration of purpose unless: (1) "the purpose that is frustrated [was] a principal purpose of that party in making the contract," (2) the frustration is "so severe that it is not fairly to be regarded as within the risks that [the party] assumed under the contract," and (3) "the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made." Id. at 806-07 (quoting Restatement (Second) of Contracts § 265 cmt. a).

The bankruptcy court did not address Appellants' frustration of fundamental purpose argument because it had already determined Appellants were not required to pay the premium deposits due in January 2003, 2004, and 2005. The BAP addressed Appellants' frustration argument and found Appellants were not discharged of their duties under the Reinsurance Contract. The BAP determined neither the losses sustained by American Growers in its MPCI business nor the NDOI's placement of American Growers in supervision and liquidation frustrated the fundamental purpose of the Reinsurance Contract because both of these events were reasonably foreseeable.

Appellants charge the BAP erred in its analysis when the BAP failed sufficiently to consider the magnitude and effect of the unprecedented losses, and determined the losses and NDOI's action were foreseeable events. Appellants also

argue if there was any fault on the part of American Growers, that fault should not be extended to AICI or AIC. As an initial matter, we note Appellants, in their brief, mischaracterize the BAP's holding. Appellants assert "the BAP found the fundamental purpose of the [Reinsurance Contract] was frustrated; but concluded the frustration was a reasonably foreseeable event and caused by actions and/or inactions of American Growers." Actually, the BAP held "[n]either [the losses sustained by American Growers nor the NDOI's placement of American Growers in supervision and liquidation] frustrated the purpose of the contract." In reaching this conclusion, the BAP reasoned Appellants anticipated potential crop losses when entering into the Reinsurance Contract, and American Growers could have avoided being placed in supervision by maintaining adequate capital levels.

Reviewing de novo, we conclude Appellants were not discharged of their duty to pay the $15 million premium by the frustration of fundamental purpose defense. The Reinsurance Contract had two principal purposes: (1) to provide reinsurance coverage at the 140% to 150% layer, and (2) to gain FCIC approval of the IGF Transaction, which would permit Appellants to purchase IGF's MPCI policies, and write their own MPCI policies. We conclude the losses and NDOI's placement of American Growers in supervision and liquidation did not frustrate the first primary purpose of providing reinsurance, because the parties did not actually expect Appellants' losses to reach the 140% to 150% layer. At trial, Martin testified it was "impossible, or certainly improbable" American Growers's losses would ever reach the 140% to 150% layer. Even with the magnitude of losses experienced by American Growers, those losses never reached anywhere near the 140% to 150% layer, which would have triggered Granite Re's duty to provide reinsurance coverage.[3]

---

[3]One could reasonably conclude the $15 million premium was solely a cost of obtaining regulatory approval.

We likewise conclude American Growers's losses and NDOI's placement of American Growers in supervision and liquidation did not frustrate the second primary purpose of the Reinsurance Contract. Both parties are sophisticated insurance companies in the business of calculating the probabilities of losses and setting the price for premiums accordingly. Estimating and assuming risks is their business. The premium due under the Reinsurance Contract was a fixed premium of $15 million. That fixed premium was not responsive to the amount of insurance Appellants wrote during the entire five-year term, nor the individual years. Thus, Appellants were required to pay a $15 million premium regardless of whether Appellants wrote billions of dollars in insurance or wrote no insurance.

We also emphasize Appellants entered into a five-year contract for a maximum $40 million reinsurance risk with Granite Re that did not provide for annual renewals or for an early termination. Appellants easily could have provided in the contract for the contingencies Appellants now plead for judicial relief.

As stated above, one of the conditions that must be met to discharge a party's duty under a contract is that the frustration was "so severe that it is not fairly to be regarded as within the risks that [the party] assumed under the contract." Restatement (Second) of Contracts § 265 cmt. a. The losses experienced by American Growers and the resulting placement of American Growers in supervision and liquidation may fairly be regarded as risks Appellants assumed under the Reinsurance Contract.

As to Appellants' argument that any fault of American Growers should not be extended to AICI and AIC, we disagree. First, the Reinsurance Contract does not distinguish between AICI and its various subsidiaries. By the unambiguous terms of the contract, the "Company," meaning AICI and AICI's subsidiaries, agreed to pay Granite Re a $15 million premium. Second, this is a contract action, not tort, and the allocation of fault has no particular relevance.

-20-

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the BAP.

_____