# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 10-2395

———————

In re: Svetlana Sergeyevna Ungar,   *
  *
    Debtor,   *
  *
----------------------------------------   *   Appeal from the United States
  *   Bankruptcy Appellate Panel
Olim Islamov,   *   for the Eighth Circuit.
  *
    Appellee,   *
  *
   v.   *
  *
Svetlana Sergeyevna Ungar,   *
  *
    Appellant.   *

———————

Submitted: November 16, 2010
Filed: February 14, 2011

———————

Before RILEY, Chief Judge, MELLOY and GRUENDER, Circuit Judges.

———————

MELLOY, Circuit Judge.

   Debtor Svetlana Sergeyevna Ungar appeals from the judgment of the Bankruptcy Appellate Panel ("BAP") affirming the bankruptcy court's[1] judgment that

---

   [1]The Honorable Thomas L. Saladino, United States Bankruptcy Judge for the District of Nebraska.

certain debts were the product of fraud and were non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and that the bankruptcy court possessed jurisdiction to reduce a non-dischargeable debt to a judgment against her. In addition, she argues in the alternative that the bankrupcty court erred in determining the amount of the judgment.

Regarding dischargeability, Ungar argues the creditor's reliance upon her representations was not justifiable. As to jurisdiction, she argues the creditor did not request a judgment in his pleadings, and the issue was not properly before the court. Regarding the amount of the judgment, she argues she should have received greater credit because she intended certain repaid sums to cover principal repayments rather than outside interest expenses that the creditor incurred. We affirm.

I.

Ungar emigrated to the United States from the former Soviet state of Moldova. Olim Islamov emigrated to the United States from the former Soviet state of Tajikistan. Islamov received an advanced education before coming to America and worked many years in various economic and accounting positions. Despite being educated, he was neither experienced with, nor knowledgeable regarding, United States stock markets. Ungar and Islamov, who both speak Russian, met in Nebraska. Ungar told Islamov that she had been successful as a day trader and induced Islamov to borrow money on credit cards for her to invest on his behalf. In exchange she was to receive a share of profits that she would generate as a day trader. Islamov initially invested $25,000.

Almost immediately, Ungar incurred losses but failed to report these losses to Islamov. Islamov continued to invest additional sums with Ungar (some borrowed on credit cards and some obtained from relatives), and Ungar continued to incur additional losses. Ungar also used sums from Islamov to cover her personal expenses, although Islamov advanced funds to her only for investment purposes.

Shortly after beginning her purported investment activities for Islamov, Ungar began representing falsely that she had generated profits for Islamov.  She reported these non-existent profits to him orally, in writing, and in spreadsheets falsely showing an increasing account balance.

Over a course of years, Islamov "invested" $503,791 with Ungar.  From the beginning, Islamov requested payouts, in part to cover interest expenses on the money he borrowed to invest with Ungar.  Ungar returned a total of $377,615 to Islamov. The parties do not contest these amounts, although Ungar characterizes the amounts she received from Islamov as loans rather than investments. Eventually, when Islamov demanded greater repayment than Ungar could provide, she admitted her scheme.  Ungar filed a voluntary Chapter Seven bankruptcy petition, and Islamov filed a complaint seeking a determination of non-dischargeability.

The bankruptcy court, ruling on a motion for summary judgment by Ungar, eliminated several claims for non-dischargeability, but allowed the case to proceed to trial on a theory of fraud, 11 U.S.C. § 523(a)(2)(A), and a theory of willful and malicious injury, § 523(a)(6).  At the trial, Ungar elected not to testify.  Islamov testified that, of the $377,615 Ungar had paid to him throughout the duration of their relationship, $102,000 represented amounts to cover Islamov's interest expenses. Thus, only $275,615 of the amount returned by Ungar represented a return of invested principal.[2]  The bankruptcy court accepted this uncontested testimony and held that Islamov's false representations regarding profits served as fraudulent statements.  The

_____

[2]Islamov actually alleged a significantly higher amount as Ungar's indebtedness to him, citing a promissory note for over $1.1 million that purportedly matched a false account balance Ungar had reported to Islamov during their relationship.  The bankruptcy court rejected Ungar's claim as to this amount, calling the non-existent earnings and profits reflected in the note "phantom" numbers.  The court stressed that the falsely reported earnings were not amounts "obtained by false pretenses, a false representation, or actual fraud."  11 U.S.C. § 523(a)(2)(A).

court found the other requirements of § 523(a)(2)(A) satisfied.[3] Accordingly, the bankruptcy court determined that Ungar had obtained the $503,791 from Islamov by fraud but gave back approximately $275,000 of principal. The court concluded the difference in these amounts, $228,791, was non-dischargeable and entered a judgment against Ungar in this amount.

## II.

"On appeal from a decision of the BAP, we act as a second reviewing court of the bankruptcy court's decision, independently applying the same standard of review as the BAP." In re Lasowski, 575 F.3d 815, 818 (8th Cir. 2009). We review the bankruptcy court's factual determinations for clear error, and its legal determinations *de novo*. Granite Reinsurance Co. v. Acceptance Ins. Cos. (In re Acceptance Ins. Cos.), 567 F.3d 369, 376 (8th Cir. 2009). "Whether a requisite element of a claim under § 523(a)(2)(A) has been satisfied is a factual determination, which we review for clear error." R&R Ready Mix v. Freier (In re Freier), 604 F.3d 583, 587 (8th Cir. 2010).

Ungar first challenges the bankruptcy court's determination that Islamov "justifiably" relied on her statements. A debt is non-dischargeable if "obtained by . . . false pretenses, a false representation, or actual fraud . . . ." 11 U.S.C. § 523(a)(2)(A). A debt may be deemed to have been "obtained by" false representations if the creditor justifiably relied on the representations. See Field v. Mans, 516 U.S. 59, 70–71 (1995). In Field, the court resolved a circuit split as to the level of reliance required by § 523(a)(2)(A), explaining the meaning of justifiable reliance. The Court distinguished justifiable reliance from reasonable reliance, noting

---

[3]In addition, the court found § 523(a)(6), willful and malicious injury, satisfied. Given our resolution of the fraud issue, we need not address this alternative ground for non-dischargeability.

"a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" Id. at 70 (quoting Restatement (Second) of Torts (1976) § 540).  The Court emphasized that creditors could not turn a blind eye where a "patent" falsity could be determined by "'a cursory examination or investigation.'" Id. at 71 (quoting Restatement (Second) of Torts (1976) § 541, Cmt. a.).  The Court, however, also emphasized that the question of whether reliance is justifiable is a subjective question dependent upon "'the qualities and characteristics of the particular [creditor], and the circumstances of the particular case,'" such that the creditor's conduct need not "'conform to the standard of the reasonable man.'" Id. at 71 (quoting Restatement (Second) of Torts (1976) § 545A, Cmt. b).

Here, we find no clear error in the bankruptcy court's factual determination that Islamov's reliance was justifiable.  As already noted, Islamov was not lacking in education, but it is undisputed he was unsophisticated in matters of American stock investing.  Ungar used her shared language to build trust with Islamov and returned $377,615 to him to perpetuate her fraud and lend credence to her false representations that the account balance was much greater than it actually was.  In the circumstances of this case, Islamov's reliance may not have been reasonable, but we cannot say the bankruptcy court erred in finding it justifiable.  We note also that Ungar elected not to contest the majority of Islamov's testimony.

Regarding the court's jurisdiction to enter a judgment against Ungar after making its determination of non-dischargeability, our review is *de novo*.  We agree with the determinations of the other circuits that have addressed this issue and unanimously concluded a "bankruptcy court, in addition to declaring a debt non-dischargeable, has jurisdiction to liquidate the debt and enter a monetary judgment against the debtor." Morrison v. W. Builders of Amarillo, Inc.(In re Morrison), 555 F.3d 473, 478 (5th Cir. 2009); see also Johnson v. Riebsell (In re Riebsell), 586 F.3d 782, 793 (10th Cir. 2009) (collecting cases from the Second, Sixth, Seventh, and

Ninth Circuits); Abramowitz v. Palmer, 999 F.2d 1274, 1279 (8th Cir. 1993) (holding a bankruptcy court possessed "related-to" jurisdiction to impose a constructive trust on a debtor's home and enter a monetary judgment against the debtor's wife, where the wife had colluded in perpetrating a fraud on the creditor).

Ungar's argument appears to go further than merely a jurisdictional argument, however, as she raises concerns of notice and alleges the possibility of a monetary judgment was not properly before the court. To the extent she presents an argument above and beyond the issue of jurisdiction, we reject her argument. First, we note that Islamov's complaint sought "such other and further relief as the Court deems just and equitable." Further, we note that parties who voluntarily seek bankruptcy protection seek a remedy that is equitable in nature, and in entering the bankruptcy court, knowingly subject themselves to the broad equitable powers of the bankrupcty court. See 11 U.S.C. § 105(a) ("[T]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); Miller v. Farmer Homes Admin. (In re Miller), 16 F.3d 240, 244 (8th Cir. 1994) (noting that the bankruptcy court's broad equitable powers are limited in that "such powers must be exercised consistent with the provisions of the Bankruptcy Code.") (citation omitted).

Here, the parties did not contest the total amount Islamov advanced to Ungar or the amounts Ungar returned to Islamov; they contested only dischargeability, whether Islamov was entitled to the falsely reported "phantom" earnings and profits, and whether Ungar should receive full credit for the amounts repaid to Islamov. The amount of debt, if any, that Ungar owed to Islamov and qualified for exclusion from discharge was precisely the issue before the court. Ungar presents no arguments or explanations to describe how she was prejudiced by any purported lack of notice or how the monetary judgment was inconsistent with any provisions of the Bankruptcy Code. In particular, she fails to explain what evidence the purported lack of notice prevented her from introducing. She also fails to explain how any alternative

-6-

monetary judgment might differ if issued later by a state court acting in reliance upon the bankruptcy court's determination of non-dischargeability.

Regarding the specific amount at issue in the present case, we agree with Ungar that there was not overwhelming evidence to support Islamov's claim that $102,000 of the returned funds were payments for credit expenses rather than repayments of principal. Still, Islamov's testimony on this issue was largely uncontested, the bankruptcy court's interpretation of the evidence was a reasonable and permissible interpretation, and it was not clear error for the district court to accept his testimony. In re Frier, 604 F.3d at 589 ("This argument, however, is one for the trier of fact.").

We affirm the judgment of the bankruptcy court.

_____