### In re Daniel J. CONORYEA, Debtor.

### Town Centre Self Storage, LLC, Plaintiff,

v.

### Daniel J. Conoryea, Defendant.

**Bankruptcy No. 08–36316.**
**Adversary No. 09–3169.**

United States Bankruptcy Court, D. Minnesota.

Nov. 3, 2011.

385

David G. Hellmuth, Hellmuth & Johnson, PLLC, Eden Prairie, MN, J. Matthew Berner, Hellmuth & Johnson PLLC, Edina, MN, for Plaintiff.

Marie F. Martin, Hoglund, Chwialkowski & Mrozik, PLLC, Roseville, MN, for Defendant.

## MEMORANDUM DECISION

### GREGORY F. KISHEL, Chief Judge.

This adversary proceeding came before the Court for trial. The Plaintiff appeared by its attorney, Craig R. Baune. The Defendant appeared personally and by his attorney, Marie F. Martin. The following memorandum decision is based upon the evidence received at trial and the briefing and argument by counsel. It is entered pursuant to Fed.R.Civ.P. 52(a)(1), *as incorporated by* Fed. R. Bankr.P. 7052.

This adversary proceeding sounds under 11 U.S.C. § 523(a)(4). It arises out of a case under Chapter 13 of the Bankruptcy Code, commenced on November 28, 2008. The Plaintiff asserts the status of a creditor of the Defendant. It seeks to have a debt fixed and liquidated via entry of a money judgment against the Defendant, and to have that debt excepted from any discharge under 11 U.S.C. § 1328(a) that the Defendant will receive in the underlying case.[1] As its sole basis for nondischargeability, the Plaintiff maintains that the debt arose from an embezzlement perpetrated by the Defendant upon it.[2]

The most basic historical facts are uncontroverted. Sheldon Badzin is a businessman in the Twin Cities metro area. Prior to 2003, he had made his living in the automobile-service industry, wholesaling parts and supplies, producing windshield de-icer fluid, and the like. He decided to leave that business sector and hit upon the rental of self-storage space as his alternative. In 2002, Badzin acquired several established operations of self-storage units in the Twin Cities area. They included one located in Eagan, Minnesota that consisted of 550 individual units. He formed the Plaintiff as the entity through which to own and operate the Eagan location.[3]

In September, 2003, Badzin hired the Defendant to manage the Eagan operation for the Plaintiff. The Defendant succeeded Julie Klug, who had managed the site during the first few months of the Plaintiff's ownership.

The Defendant worked for the Plaintiff in that capacity until February, 2006. At that time, Badzin terminated his employment on the ground of insubordination.[4]

As to the specific charge of this adversary proceeding, it is undisputed that $25,915.00 of payments received in cash from renters of self-storage units during the Defendant's tenure as manager were

---

1. As such, this is a core proceeding in the Defendant's bankruptcy case, 28 U.S.C. § 157(b)(2)(I), hence within the bankruptcy jurisdiction of the federal courts, 28 U.S.C. § 1334(b), and subject to entry of final judgment at the order of a bankruptcy judge, 28 U.S.C. § 157(b)(1). The bankruptcy court has the jurisdiction and statutory authority in dischargeability litigation to order and enter judgment on the underlying debt, if it determines that the debt is nondischargeable. *In re Ungar*, 633 F.3d 675, 679–680 (8th Cir. 2011).

2. Since the effective date of the Bankruptcy Abuse Prevention and Consumer Protection

Act of 2005, Pub. L. No. 109–8, a debt within the scope of 11 U.S.C. § 523(a)(4) is excepted from discharge in a Chapter 13 case. 11 U.S.C. § 1328(a)(2).

3. Over the ensuing three years, Badzin acquired ten other operations in self-storage and related property management, and completely divested himself of his interests in auto-related businesses.

4. The parties disagree as to whether this accusation was justified, but that is not directly material here. Apparently, the Defendant's ensuing application for unemployment compensation benefits was denied.

not deposited into the Plaintiff's business bank accounts.

These rent collections were not logged as receipts of revenue into the Sentinel cash management software that the Plaintiff used at the site's office in Eagan.[5] Rather, each receipt of cash within this total was evidenced in Sentinel only by an entry bearing a "680 code." This coding operated as an "editor change," that could be used to reschedule a renter's due date to a future setting, without actually booking a receipt of rent revenue that would have tied back to a bank deposit management function of the software. Via this entry, the particular renter's account would not show as past-due in the wake of the entry until the readjusted date. Any one managing or reviewing the rent roll would not be able to tell from Sentinel whether all rents for the particular customer were current.

Finally, it is undisputed that these funds passed through the Defendant's hands; as manager, he received the cash payments from the renters.[6]

But after that, there is a sharp dispute between the parties as to the actual disposition of the funds and its propriety. The Plaintiff accuses the Defendant of embezzling the funds, scooping the money for himself without either booking or depositing the cash receipts as he should have. The Defendant maintains that he issued separate, handwritten receipts for such payments if requested by a renter; that he separately banded the cash from each payment with a carbon copy of the handwritten receipt; and that he placed these component parts into the same envelope that he used to accumulate and hold Sentinel-entered payments made via check until Badzin picked them up from the Eagan office. He says that Badzin allowed him to do all this, and had informed him that he (Badzin) "would take care of it" by other means after his pickup of the deposit, insofar as the accounting was concerned.[7] The Defendant insists that he was forced to use this off-line, informal, and irregular procedure because the Sentinel software repeatedly crashed when he tried to input cash-format payments through its sequencing. The software's failure, he says,

5. The software was specifically designed for the management of a self-storage operation. The Plaintiff inherited the software and the PC on which it was run from its predecessor-owner of the Eagan site.

6. The amounts, the relevant periods of time, the fact of receipt from tenants, the non-deposit at the Defendant's instance or otherwise, and the lack of precise accounting entry in the Sentinel system are established by paragraphs 7 through 10 of the parties' pre-trial stipulation of facts. The basic financial content of these provisions was backed up by the testimony of Marinda Carr, an employee of the Plaintiff as successor-manager of the Eagan site. Carr is a former bank fraud investigator. She testified to having performed an audit of the rent receipts, dispositions, and data entry onto Sentinel that had occurred during the Defendant's tenure as manager. She stated that this project had

taken her "hundreds of hours." The stipulation's provisions are phrased in the passive voice (that almost certainly deliberate). This does not enable the actor to be identified, i.e., the individual who received the money from the renters. However, the testimony at trial established that the Defendant was the only employee actually on-site for the great majority of the time that the office was open during his tenure. And, he was the only on-site employee responsible for day and weekend accounting and preparation of bank deposits. At the end of his testimony, in response to questioning by the Court, the Defendant admitted that the funds in question had actually passed into his hands from the renters.

7. The Defendant testified that a Sentinel software technician made the original suggestion to him, that he make a paper receipt for cash payment to enable him to send customers on their way.

was a real problem because it prevented him from promptly giving a Sentinel-generated payment receipt to any impatient renter waiting in person. He testified that he had largely given up even trying to use Sentinel for the bulk of cash receipts because of the incidents of crashing.[8]

This presented a dispute of fact. Because the relevant processes and transactions were handled off the books, the evidentiary record as to what really happened came down to a "he-said, he-said" contrast.

This impasse had to be resolved for the purposes of fact-finding; and that basically came down to an assessment of credibility. Two different aspects of the evidence must be analyzed: the in-court demeanor of the two witnesses competent to testify to the historical events as they happened (Badzin and the Defendant), and the broader fact content of the respective "narratives."[9] The credibility of the narratives must be measured both internally (i.e., by the cohesiveness of each side's proof to the central features of its narrative, including the presence or absence of internal contradictions) and externally (i.e., measured against the "normal" practices and flows of events in like circumstances, given human nature and the standard expectations of parties in the relevant social and economic context).

For various reasons, the contest between the narratives was not as one-sided as the Plaintiff's counsel insisted.[10] But in the end, the Plaintiff's theory of fact is the more credible; and that conclusion is reached not just because one side must prevail over the other in litigation's adversarial context. The reasons are as follows.

*First*, there is the demeanor of the two witnesses on the stand. Badzin was controlled, tight, and firm in his testimony. His responses were clipped—simple yes-and-no answers to his counsel's leading questions, and very precisely-worded and terse responses when narrative was required. Throughout, he was utterly firm in his insistence that he never would have countenanced a separate, off-the-books cash stream from the Plaintiff's daily revenues, and that he never would have extracted cash in that manner for his own use or for other application. Such demeanor was entirely consistent with his status in life and work, as an intelligent, seasoned, take-charge entrepreneur who would have recognized the vast power of words in human interaction and commerce—and for whom the projection of certainty would have been long ingrained by the demands of a competitive business environment. It also could have been couched by past experience as a witness in a courtroom.

In marked contrast, the Defendant was animated, insistent, and voluble in his responses. He seemed utterly eager to have

8. In ¶ 5 of the stipulation of facts, the Plaintiff admitted that the equipment on-site was "an older computer that frequently 'crashed.'"

9. The term "narrative" as used here equates to an overall theory of historical fact, as propounded by one side or the other for the litigation.

10. Counsel righteously insisted that the Defendant's narrative had to be rejected out of hand, as patently absurd. He summed this up in the rhetorical question, "why would he [Badzin] steal from his own business?" This was the zealous flourish of an advocate; but it does not prevail on a more measured consideration of context. The query is even somewhat fatuous. There are reasons why the owner of a closely-held corporation might be tempted to divert cash revenues off the books to his own pocket if they were sufficiently difficult to trace. The most prominent, of course, would be the avoidance of corporate or individual income taxes otherwise assessable on that component of a business revenue stream, whether the entity be a "C corporation" or an "S corporation."

his more extended narrative heard. His spontaneity gave no betrayal of underlying guile. But his demeanor also could have been the mark of someone who had swung his perspective around to create and to believe increasingly in an alternate past—a version of a story that would rationalize his personal involvement in something that had a bad result, and perhaps allow forgiveness for whatever he had done to bring it about. People do convince themselves of the reality of an alternate history for harrowing past events; and often it is more the result of simple human weakness than actual dishonesty.

But, there was no significant chink in the surface of either witness's demeanor-no flinching, ocular evasion, inappropriate gesture or tic, or spontaneous emotive act consistent or inconsistent with the thrust of the given narrative. And, neither of them dissembled or equivocated about any aspect of their narratives, on direct or cross-examination. So, there is no decisive weight to be assigned to witness demeanor in the assessment of credibility, or even any great significance. It is pretty much of a balance.

So, *second,* overall credibility will turn on the believability of each side's narrative—i.e., whether the recitation of events, actions, and thoughts by a particular side presents a cohesive and consistent story, and whether that story makes sense given what most people in a like situation would do to best protect their own interests in a responsible and lawful manner.

On that level, inconsistencies and irregularities emerge—and significantly more are found in the Defendant's version of the facts than in the Plaintiff's. This comes in large part from the basic theme of the defense narrative, the cause that he says drove everything that followed.

The Defendant justified his initiation of an informal, ad hoc, off-books treatment to

memorialize and process cash receipts as a response to equipment failure. He insisted that he could not use Sentinel to book cash receipts because of the nearly-invariable crash of the site's PC when he tried to input a cash transaction. He testified that "the computer started crashing every time" he made such an attempt, after he had succeeded in raising the site's renter occupancy level from around 50% to "up to 100%." The insinuation was that the greatly-increased number of transactions loaded the PC's aging processor with so much data that it could not run the Sentinel program adequately. To send impatient renters on their way more quickly, he said, he used the irregular form of cash processing summarized earlier. Then, he said, he gave the compiled product of that parallel process to Badzin, on the latter's assurance that he "would take care of it" for the Plaintiff's accounting. The clear insinuation of the defense narrative is that Badzin eventually sought to make the Defendant the "fall guy" for a cash siphoning that the Defendant had not committed.

■ However, from the attributed root cause on through, the defense narrative has too many external and internal inconsistencies to preponderate, in the weighing of the evidence:

*1.* The Defendant testified that he had made strong efforts to boost the occupancy of the facility from the beginning of his employment, by promotional discounts and other means. As more members of a larger renter population presented cash payments, he said, Sentinel crashed more and more frequently; and he attributed that to old hardware that did not have the capacity to handle increased data storage and processing, with some sort of particular flaw in the programming for the cash-payment option in Sentinel.

However, the undisputed hard evidence, rental records received as Plaintiff's Exhibit 34, show that occupancy fluctuated between 67% and 72% during the year before Badzin hired the Defendant; and it ranged between 63% and 74% while the Defendant was the manager. Badzin testified that the occupancy was "in the mid–60s" when he hired the Defendant and that it "peaked at 74%" in July, 2005. The swing of several percentage points went both ways, and it was far smaller than what the Defendant testified to in a much less precise fashion. There simply is no evidence to support a finding of any sustained upward trend in occupancy over the length of the Defendant's tenure, let alone one of 20 or more percentage points.

So, there is no basis for the urged inference on causality, that greatly-increased business volume regularly overwhelmed obsolescent equipment and required the Defendant to compensate by using an irregular method of managing cash receipts.

**2.** The evidence going to the experience of the site managers before and after the Defendant's tenure is not consistent with the Defendant's attribution of cause, either. The Defendant justified his frequent use of the 680 coding by pointing to external circumstances that imposed too much stress on an outdated system. However, there is no evidence that either his predecessor or his immediate successor as manager used the 680 coding in any marked frequency, let alone the frequent resort characteristic of the Defendant's

tenure. And, if anything, the record suggests that the raw incidence of cash payments as a component of rent receipts was dropping over a longer period. Marinda Carr testified on cross-examination that the component of cash receipts booked to Sentinel was higher in 2002–2003, before the Defendant's employment, than it was in the three months immediately after the Defendant was terminated when Bill Larson managed the Eagan site on an interim basis.[11]

But, as Carr indicated, the component of booked cash receipts during Larson's management was still markedly greater than during the Defendant's—when they constituted less than 1% of the rent receipts that were input into Sentinel.[12] Clearly, Larson was able to use Sentinel to properly memorialize a material level of cash rent payments. That fact significantly undercuts the Defendant's insistence that computer error required him to use the 680 code in the first place.[13]

**3.** The Defendant testified that on occasion Sentinel crashed when he was inputting a credit card transaction. He stated that he responded by rebooting the computer, and inputting the transaction anew so as to generate a receipt for the renter. Marinda Carr's analysis showed that no 680–coded transactions input during the Defendant's tenure could be tied back to payments later booked as having been made via credit card. That bare circumstance could bolster the Defendant's testimony on this very limited point, par-

**11.** Larson was the manager at the Maypack Products operation that Badzin was operating, a vendor of packaging supplies and shipping that serviced renters of self-storage units and customers who were moving. He stood in at Eagan before Carr herself was hired as manager.

**12.** The booked cash intake for the second quarter of 2006—the one after the Defendant

was terminated—was $7,603.56. This compares to $2,237.64 for the first quarter of 2006, the last period of the Defendant's management. *See* Plaintiff's Exh. 34.

**13.** There is no evidence that Badzin had the hardware or the software upgraded before Larson stood in, or during the three months he handled the Eagan site.

ticularly given Carr's admission that Sentinel had crashed "occasionally" for her on a payment made by credit card.

But, this does not jibe entirely with the Defendant's explanation that using 680–coded transactions for cash payments became routine for him. Yes, there might be a justification for different responses to the computer crashing, in terms of a large potential waste of the Defendant's time (on a much larger number of cash payments) against a very limited one (on a few made by credit card).[14] But the question is obvious: why would a customer using a credit card be any more patient than one paying cash, when confronted with the delay of a computer crash and a rebooting in order to generate a receipt? After all, the Defendant testified to a reboot taking 15 to 20 minutes.

*4.* The Defendant testified that he had sometimes used the 680 coding to defer an account's due date at Badzin's direction, without extracting payment from the renter. According to the Defendant, Badzin did this to delay any sort of recorded basis that might prompt the commencement of lien foreclosure against the renter's assets.[15] The reason, he said, was that Badzin did not want to incur the expense of lien foreclosure at that time, and that Badzin "would allow them to owe him thousands of dollars because he'd collect" from the liquidation of the delinquent renter's property eventually.

Neither side interrogated Badzin on this. But even in isolation, the Defendant's statement just does not make a lot of sense. The notion was that Badzin was willing to allow the accrual of large amounts of late fees and delinquent rents, on the assurance of a later recovery from selling stored personalty or extracting cash from the renter by withholding possession.[16] In context, such a business strategy simply would not have been sound.

First, Badzin was relatively new to this sort of business. Thus, he had no personal experience from which to gauge the risk to be incurred from shifting his recourse from current collection of cash to statutorily-liened personalty of unknown identity and value. Second, Badzin was in the business of generating liquid cash directly by collecting rents. He was not in the business of acquiring and reselling used personalty. As to the predictable realization of value, there is just no comparison between the two, as to cost or risk; cash was what Badzin needed to get his whole endeavor off the ground and stable, and getting that directly from compliant renters was the means to get it most predictably and economically.

Badzin obviously was a hard-headed businessman and would have had no defensible financial motivation to delay calling renters to account in cash. The Defendant suggested that he had used the 680 code with some frequency to support such a

14. The lack of 680–coded transactions linkable to later-processed payments by credit card might be explained by a need to electronically and directly process the payment in real time by reading the magnetic strip on the card. Perhaps the Plaintiff did not use the older, card-imprinted form of handwritten receipt, later presented in hard-copy to the credit card issuer. This, however, is only speculation. Neither side presented any evidence on this possibility, however much they dwelt on the background phenomenon.

15. The reference here apparently was to the lien granted by the Minnesota Liens on Personal Property in Self–Storage Act, Minn.Stat. §§ 514.970–514.979. The Plaintiff's counsel developed this testimony from the Defendant on cross-examination, and had him explain a particular incident.

16. *See* Minn.Stat. §§ 514.973 and 514.972, subds. 4–5.

strategy at Badzin's behest; but this is just not credible. Its lack of credibility naturally casts doubt on other aspects of the Defendant's narrative.

5. The Defendant claimed that he was not able to include the 680–linked cash receipts as a component of the 810–coded cash receipts on Sentinel's separate "daily cash collections log," because the program required the component entries and totals for receipts on both of them to match. However, it is clear from other Sentinel-generated documents in the record (for example, the June 30, 2005 bank deposit log, part of Plaintiff's Exh. 1, which contains handwritten notations such as "rack," "Box sales," "2 units," and "3 month spec.") that the Defendant manually annotated the logs on Sentinel. Given the program's multiple and integrated functionality as a daily management tool, two things would have been prudent. Narrative explanations under the 680–coded entries could have been made electronically or in-hand, to justify the resets of due dates.[17] And, narrative notes could have been made in the daily cash collections log to reflect the 680–coded transactions for the day, even if fields for payment amounts could not have been completed under the 810 code. Using this functionality would have been less unorthodox and more standardized—and it would have provided a beneficial redundance. The Defendant's failure to use the expedient does not say anything positive about the overall credibility of the defense narrative.[18]

6. The Defendant's narrative posited the use of handwritten receipts prepared in duplicate for all 680–coded cash payments, one of each such receipt bundled with the cash and given to Badzin and the other maintained at the office at Eagan. Yet, the defense did not offer any such documents into evidence. Nor did it develop any testimony at all on cross-examination of either of the Plaintiff's witnesses, that went to the existence or nonexistence of those documents among the Plaintiff's records on-hand. There was not even the mention of an attempt to get them from the Plaintiff via discovery procedures during the course of this litigation, whether frustrated by a denial or not.

7. The overall theory of the defense had a semi-articulated implication: Badzin himself had skimmed the cash at issue here, exploiting the fortuity of the Defendant's use of an off-book parallel system for handling such receipts. A less savory possible motivation for that has been mentioned earlier, at n.10.

However, given the realities of Badzin's contemporaneous position in this line of business, the suggestion is not credible. Badzin testified that his lender for his new endeavor, Venture Bank, had granted him a line of credit on a "debt servicing coverage ratio" covenant. Under that, Badzin had every motivation to maximize the booked amount of income from all his locations, to lessen the likelihood that the Bank would deem him out of compliance and then restrict or terminate the line. As a relative newcomer to an unfamiliar sort of business activity, Badzin had every motivation to stay flexible in credit availability.[19] In addition, as Badzin testified, the

---

17. As Carr testified, the presence of a 680–coded entry alone *could* reflect that a tenant had done *something* on the date indicated— but without narrative it could not be determined *whether* or *what*.

18. It really need not be said, but will be: it would have given the Defendant every cover from the accusation he faces now.

19. In fact, in 2005 Badzin's banker drew his attention to operating losses at the Eagan location for 2004–2005. Badzin was able to

amount of booked income and the profitability of the location would bear directly on its value, were he to consider selling the business.[20] From these hard-headed considerations, there would have been much less benefit for Badzin from skimming, than in accurately booking all cash receipts. These externals bolster the credibility of the Plaintiff's narrative, and undercut that of the defense's.

8. A final point on credibility goes in part to the motive for this litigation, though that is irrelevant for the merits. There is the obvious question as to Badzin even pursuing the Defendant: why buy trouble?

Per Badzin's testimony, Bill Larson was the first to uncover evidence that the Defendant had used a parallel system for cash receipts, when a tenant produced a handwritten receipt from the Defendant after Larson notified the tenant he was delinquent for the prior rental period. Badzin first went to customer service at Sentinel and inquired about the propriety of the Defendant's actions in failing to book such income. He then hired Carr to audit the records in Sentinel. After that he retained a private investigator to evaluate the legalities of what she found. Finally, Badzin reported the matter to the Eagan Police Department. From its investigation, a criminal prosecution was commenced against the Defendant.

The Defendant insinuated that all of this was done to cover up Badzin's failure to account for the cash, and to shift the blame to him. Given the downside of such a strategy, this is simply not credible. The

substantial expense aside, there was a very real risk that law enforcement could have concluded that Badzin himself did the skimming. He could have been prosecuted for tax evasion. From a confined, cost-benefit analysis, one may question the soundness of pursuing the Defendant to these lengths; but the fact that Badzin did put this much into it is not very consistent with fabricating a case against the Defendant.

■ On the whole, the Plaintiff's narrative of the relevant events is the more credible. The Plaintiff's evidence supports findings that satisfy the elements of an embezzlement under 11 U.S.C. § 523(a)(4). *See In re Phillips,* 882 F.2d 302, 304 (8th Cir.1989); *In re Belfry,* 862 F.2d 661, 662 (8th Cir.1988). First, there is the presence of the collected cash rents lawfully in the Defendant's hands, in his capacity as manager and as received from the Plaintiff's renters. Then, there is the appropriation of those funds by the Defendant. The more credible evidence supports the finding that the Defendant took the funds for his own use. Finally, that appropriation was fraudulent. The more credible evidence supports the finding that the Defendant concealed his appropriation, when he had a duty to report and turn over the cash receipts. So, a debt owing by the Defendant to the Plaintiff is nondischargeable.

The Plaintiff requests a money judgment to recover on that debt. The base amount—the value of the money not accounted for and taken from the Plaintiff—is established by the stipulation, at $25,915.00.

resolve the issue "on a friendly basis" by bolstering the location to a net profit in 2006.

**20.** As is well-known, under standard appraisal principles the income method of valuation is driven by raw volume as well as profitability. As Badzin testified, he maintained cash-

basis accounting for these operations, and not accrual-basis accounting. Thus, without a showing of collected cash on the books, "there was no value" to be attributed to any transaction or status associated with a particular renter.

But the Plaintiff seeks a multiplier on top of that, double damages under Minnesota's "civil theft law," Minn.Stat. § 604.14, subd. 1.[21] As the Eighth Circuit has held, the language of this statute only "caps the punitive award and makes clear that not every victim is entitled to the full punitive recovery" that is possible under the statute. *OnePoint Solutions, LLC v. Borchert,* 486 F.3d 342, 348 (8th Cir.2007). A plaintiff seeking an award under Minn. Stat. § 604.14, subd. 1 must produce evidence going to an appropriate amount for an award. *Id.* And, for the purposes of this statute as generally, punitive damages " 'are intended to punish a defendant, or to make an example of a defendant's wrongdoing,' not to reward an otherwise-compensated plaintiff." *Williamson v. Prasciunas,* 661 N.W.2d 645, 653 (Minn.Ct.App. 2003) (quoting *Ulrich v. City of Crosby,* 848 F.Supp. 861 (D.Minn.1994)).

The Plaintiff did not make an evidentiary showing from which a fact-finder could determine a measured award of punitive damages against the Defendant, one that would cause him some economic pain, appropriate punishment, but which would not be draconian. In the absence of that, without any development of argument on proportionality, and with only a conclusory demand for double damages, there is no support in the record for an award of punitive damages. The Plaintiff is "otherwise-compensated" by a judgment for the recovery of the stipulated amount.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED:

1. The Plaintiff shall recover from the Defendant the sum of $25,915.00.

2. The debt evidenced by Term 1 is excepted from any discharge that will be granted to the Defendant in BKY 08–36316, by operation of 11 U.S.C. § 523(a)(4).

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

21. In pertinent part, this statute provides:
    A person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50 or up to 100 percent of its value when stolen, whichever is greater.