# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3557
_____

In re: Daryll Christopher Dykes; Sharon Luster Dykes

Debtors

------------------------------

James L. Snyder, United States Trustee

*Appellee*

v.

Daryll Christopher Dykes; Sharon Luster Dykes

*Appellant*s

_____

Appeal from the United States Bankruptcy
Appellate Panel for the Eighth Circuit

_____

Submitted: December 12, 2019
Filed: April 3, 2020

_____

Before LOKEN, GRASZ, and STRAS, Circuit Judges.

_____

LOKEN, Circuit Judge.

Daryll and Sharon Dykes ("Debtors") filed a voluntary petition for relief under
Chapter 7 of the Bankruptcy Code, reporting just under $400,000 in assets, over $5.6

million in liabilities, and a monthly income insufficient to cover expenses. Before the Chapter 7 trustee finished gathering assets and administering the bankruptcy estate, the United States Trustee objected to Debtors' discharge in bankruptcy. See 11 U.S.C. § 727(a), (c)(1).[1] After a bench trial on that issue, the bankruptcy court[2] denied a discharge on various grounds. In re Dykes, No. 16-42199-KHS, 2018 WL 5819371 (Bankr. D. Minn. Feb. 26, 2018). Debtors appealed, raising numerous issues. The Bankruptcy Appellate Panel ("the BAP") affirmed. In re Dykes, 590 B.R. 904 (B.A.P. 8th Cir. 2018). Debtors appeal, again raising numerous issues. We independently review the bankruptcy court's decision, applying the same standard of review as the BAP. In re Ungar, 633 F.3d 675, 678-79 (8th Cir. 2011). Reviewing the bankruptcy court's factual findings for clear error and its legal conclusions *de novo*, we affirm.

## I. Background.

On Schedule A/B of their July 2016 Chapter 7 petition, Debtors averred that the only jewelry they owned was a wedding ring worth $35, a wedding band and anniversary ring collectively worth $700, two sets of cufflinks collectively worth $1,250, and a watch winder worth $12,000. They averred they did not have "other property of any kind [they] did not already list" and had no ongoing monthly expenses related to "childcare or children's education costs." On their Statement of Financial Affairs ("SOFA"), Debtors disclosed that in the ninety days before the

---

[1]The Chapter 7 trustee represents the bankruptcy estate. The United States Trustee "may be compared with a prosecutor, and serves as a bankruptcy watchdog to prevent fraud, dishonesty, and overreaching." Charges of Unprofessional Conduct Against 99-37 v. Stuart, 249 F.3d 821, 824 (8th Cir. 2001) (cleaned up). In this opinion, "the Trustee" refers to the United States Trustee, not the Chapter 7 trustee.

[2]The Honorable Kathleen H. Sanberg, Chief United States Bankruptcy Judge for the District of Minnesota.

petition, they paid $4,000 to North Dakota State University ("NDSU") and $3,020 to Lux Communities to cover their son's tuition and rent.  On Question 13, they listed no gifts above $600.  On Question 18, they claimed no transfer of any property within the last two years, "other than property transferred in the ordinary course of [their] business or financial affairs."

In early September, the Trustee notified the court it had "reviewed all materials filed" and determined that the case was "presumed to be an abuse" under 11 U.S.C. § 707(b).  On February 1, 2017, after the bankruptcy court twice extended the Trustee's deadline to file an objection to discharge, Debtors filed Amended Schedules A/B and C and an Amended SOFA.  On Question 18, they now disclosed $108,473.77 of payments relating to their son's attendance at the NDSU and their daughter's attendance at the University of California, Riverside.

In a status report after a meeting of creditors, the Chapter 7 trustee noted "a potential fraudulent transfer" issue based on the return of "twenty to thirty valuable watches" to Ezra Bekhor of Bellusso Jewelers in Las Vegas.  Bekhor filed a $413,788 unsecured claim.  The Chapter 7 trustee also filed a successful motion for turnover, securing various household items including the watch winder.

The Trustee filed its Complaint on February 15, 2017, asserting three grounds for denying Debtors a discharge:  under 11 U.S.C. § 727(a)(2)(A), for transferring thousands of dollars to their children in the year preceding the petition with the intent to hinder, delay or defraud a creditor; under § 727(a)(4), for failing to disclose numerous and substantial transfers to their adult children within two years prior to commencement of the bankruptcy case; and under § 727(a)(3), for failing to maintain

-3-

adequate records regarding "numerous and valuable watches which were transferred to Bellusso."[3]

The Trustee's case proceeded to trial on October 13, 2017. Both Debtors testified to events leading up to their bankruptcy.[4] About ten years prior, Mr. Dykes was earning "well over a million dollars a year" as an orthopedic surgeon. He holds a medical degree, a Ph.D. in molecular biology, and a law degree. Ms. Dykes holds a medical degree and operated a solo practice specializing in colon and rectal surgery, which brought in "several hundred thousand dollars a year." The couple lived with their five children in a $3 million home, built through financing provided by Alliance Bank and homebuilder Lecy Construction.

Debtors' fortunes declined during and after the "national foreclosure crisis" in 2008. The Alliance Bank employee who arranged their mortgage was convicted of mortgage fraud. Alliance Bank refused to restructure the loan, and Debtors were unable to pay a multimillion-dollar balloon payment that came due. Alliance Bank sued and eventually recovered a judgment that is now a $2.4 million claim against the Chapter 7 estate. In 2011, Alliance Bank foreclosed and Debtors lost their home. When moving out in 2012, the family placed "hundreds of thousands of dollars" worth of household goods in portable containers at Dart Storage. They did not pay

---

[3]The Trustee later identified two additional grounds for denial of discharge in its trial memorandum and a post-trial brief: under § 727(a)(5), for an unexplained loss of assets regarding "household goods and furnishings" and a "substantial amount of jewelry," and under § 727(a)(2)(B), for transferring money to their children after the date of filing "with intent to hinder, delay or defraud a creditor." As we affirm the denial of discharge under § 727(a)(3), we need not consider the bankruptcy court's resolution of these claims.

[4]For clarity, we will refer individually to Dr. Daryll Dykes as "Mr. Dykes" and Dr. Sharon Dykes as "Ms. Dykes."

rent for "nine or ten months," and with $10,000 owing, Dart auctioned off their belongings. Debtors made no accounting of the forfeited property.

To collect its judgment, Alliance Bank levied Mr. Dykes's interest in his medical practice. He left to form two new groups in late 2011. Initially successful, the new practice struggled after passage of the Affordable Care Act and loss of provider designations with major medical insurers. At the time of trial, Mr. Dykes was serving as a health policy fellow in Washington, D.C. Despite these financial strains, Debtors continued to pay a "significant majority" of their college-age children's educational expenses. Mr. Dykes testified those expenses were "absolutely central to [the family's] normal business and financial affairs."

Mr. Dykes testified that he is an avid collector of expensive watches. Invoices admitted at trial showed that, between November 2008 and March 2012, Mr. Dykes purchased twenty-one watches from Ezra Bekhor of Bellusso Jewelers in Las Vegas. Mr. Dykes testified he ultimately acquired 27 watches, as well as the watch winder. He also purchased jewelry. The invoices showed he received a Cartier bracelet worth $4,350, four sets of Kwait earrings collectively worth over $16,000, and a Kwait "Bridal Collection" ring with a 3.15 carat diamond worth over $68,000.

Although every invoice recorded deliveries, few recorded payments. Only five watches purchased in 2008 and valued at $145,650 were marked "paid." Another invoice documented credit received for returning three of the four sets of Kwait earrings. Mr. Dykes testified that his relationship with Bellusso "became very informal" once he became a regular customer. Bellusso would send him watches; he would keep the ones he liked and return the others, with no paperwork. The arrangement resulted in a "running total" by Bellusso as it charged and credited watches and jewelry Mr. Dykes received and returned. By late 2011, the amount unpaid rose to $390,700. Unable to pay, Mr. Dykes signed a confession of judgment in that amount.

In February 2013, to partially satisfy that judgment, Mr. Dykes returned twenty-seven watches and the $68,000 bridal collection ring to Bekhor's Minneapolis attorney. Mr. Dykes documented the returns with a receipt, listing the make, model, and serial number of each item, but not the value of the items or the balance due after the returns. Mr. Dykes did not return the "presentation cases" in which Bellusso had delivered the watches, which increases their value. He testified that some cases suffered water damage in his basement, while others were lost in the storage container auction. Of the twenty-one watches appearing on invoices introduced at trial, at most ten appeared on the list of returned items.

After trial, the bankruptcy court denied discharge. It rejected the Trustee's claims under §§ 727(a)(2)(A) and (B) but agreed with the Trustee on three grounds. First, the court denied discharge under § 727(a)(3), finding that Debtors had unjustifiably failed to keep adequate records regarding the "purchase, sale and return of hundreds of thousands of dollars in jewelry." The court expressly found that Mr. Dykes's testimony "regarding the purchase of the watches without paperwork or receipts" was not credible:

> [I]f only for insurance purposes, a jeweler would want to make sure that a valuable item was received by a customer and would issue a receipt. Similarly, a sophisticated collector and customer would want documentation regarding a return.

The court concluded that Debtors' failure to document purchases and returns of hundreds of thousands of dollars in watches and jewelry "makes it impossible to ascertain [their] financial condition and material transactions." It "defies logic that [Debtors] did not receive or keep documents indicating the value of the returns to be deducted from the balance owing on the Confession of Judgment." Though Mr. Dykes testified additional records were in the forfeited storage containers, Debtors failed to provide any accounting of the personal property they lost in the auction.

The bankruptcy court also denied discharge under § 727(a)(4)(A), finding that Debtors failed to disclose substantial transfers for the benefit of their adult children, and under § 727(a)(5), finding that they failed to document what happened to the five valuable watches purchased in 2008 and marked as "paid" on the invoices, and failed to provide an accounting of the assets allegedly lost in the storage containers.

On appeal, the BAP in a thorough opinion agreed with the bankruptcy court's determination that Debtors failed to maintain adequate records of valuable watch transactions and failed to meet their burden to justify this lack of adequate records. Accordingly, the BAP affirmed the denial of discharge under § 727(a)(3) without addressing §§ 727(a)(4)(A) and (a)(5). Debtors appeal. Like the BAP, we affirm the denial of discharge under § 727(a)(3) and decline to consider the other issues Debtors raise on appeal.

## II. Discussion.

**A.** Chapter 7 of the Bankruptcy Code allows debtors to discharge their debts by liquidating assets to pay creditors. See 11 U.S.C. §§ 704(a)(1), 726, 727. Section 727(a) lists grounds for denying a discharge to prevent debtor abuse of the Bankruptcy Code. As denial of discharge is a harsh remedy, the provisions of § 727(a) "are strictly construed in favor of the debtor." In re Korte, 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001). But an objecting party need only establish one ground to support a discretionary denial of discharge by the bankruptcy court. See Union Planters Bank, N.A. v. Connors, 283 F.3d 896, 901 (7th Cir. 2002).[5]

Section 727(a)(3) authorizes denial of discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information,

---

[5]Debtors do not argue on appeal that the bankruptcy court abused its discretion in denying a discharge.

including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." This provision "make[s] the privilege of discharge dependent on a true presentation of the debtor's financial affairs." In re Cacioli, 463 F.3d 229, 234 (2d Cir. 2006) (quotation omitted). Although this court has never addressed § 727(a)(3), the BAP has applied it in numerous cases. See, e.g., In re Swanson, 476 B.R. 236, 240-41 (B.A.P. 8th Cir. 2012).

To present a prima facie case under § 727(a)(3), the objecting party (here, the Trustee) must show "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." Meridian Bank v. Alten, 958 F.2d 1226, 1232 (3d Cir. 1992). The test is "whether there is available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained." Id. at 1230 (quotation omitted). "The debtor is required to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate." In re Wolfe, 232 B.R. 741, 745 (B.A.P. 8th Cir. 1999) (quotation omitted). If the Trustee meets that initial burden, "the burden of production shifts to the debtor to offer a justification for his record keeping (or lack thereof); however, the objecting party bears the ultimate burden of proof with respect to all elements of this claim." In re Swanson, 476 B.R. at 240. These are questions of fact. Section 727(a)(3) embodies an objective standard of reasonableness; it does not require proof of intent. In re Wolfe, 232 B.R. at 745.

**B.** We agree with the BAP that the Trustee met its initial burden because Debtors' failure to keep adequate records left the bankruptcy court "without a way to determine the exact transactions between the Debtors and the jeweler." We do not agree with the Trustee that Debtors had the same "duty to create and preserve

records" of their watch and jewelry transactions as a Chapter 7 debtor operating a business with substantial assets that is the focus of the bankruptcy case. But even in a consumer bankruptcy, the debtor has a greater duty to keep records of "a sudden and large dissipation of assets." 6 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 727.03[3][g] at 727-34 (16th ed. 2019).

Mr. Dykes's return of twenty-seven valuable watches and the Kwait bridal collection ring to Bekhor, a judgment creditor, was such a "sudden and large dissipation of assets." See, e.g., In re Buzzelli, 246 B.R. 75, 113-14 (W.D. Pa. 2000) ($190,000 art and wine collections). Nor was Mr. Dykes a typical consumer debtor. He was a sophisticated collector of highly valuable watches and jewelry, and his purchase and return transactions had a significant impact on Debtors' financial condition. The transactions also impacted the legitimacy of the jeweler's bankruptcy claim for the complete Confession of Judgment, despite Mr. Dykes's testimony that he returned the watches to partially satisfy that judgment. The only record of the returns was a receipt that utterly failed to substantiate the financial effect of the transaction. This was sufficient evidence to shift the burden of production to Debtors to justify their lack of adequate records.

**C.** In determining whether a debtor's record keeping was justified, the Bankruptcy Code "requires the trier of fact to make a determination based on all the circumstances of the case." Meridian Bank, 958 F.2d at 1231. The inquiry turns on factors such as the education, experience, and sophistication of the debtor; the volume and complexity of the transactions; and "any other circumstances that should be considered in the interest of justice." Id. (quotation omitted). For this inquiry, "the trial court must first determine what records someone in like circumstances to [the Debtor] would keep." In re Sendecky, 283 B.R. 760, 764 (B.A.P. 8th Cir. 2002).

We agree with the BAP and the bankruptcy court that Debtors failed to justify their failure to keep adequate records. At the time Mr. Dykes returned the watches

to Bellusso, Debtors were considering bankruptcy, and creditors were circling. Alliance Bank, a judgment creditor, had foreclosed Debtors' home and levied Mr. Dykes's interest in his medical practice. Lecy Construction was another substantial judgment creditor. In these circumstances, a reasonable person would insist on documenting the impact of this transaction on his financial condition. See In re Caneva, 550 F.3d 755, 762 (9th Cir. 2008) (undocumented $500,000 payment to third party); In re Gordon, 83 B.R. 78, 81 (Bankr. S.D. Fla. 1988) (undocumented sales of jewelry); In re Young, No. 08-32333 RTL, 2010 WL 4777626, at *9 (Bankr. D.N.J. Nov. 15, 2010) (failure to document resale of consumer goods purchased on credit). Mr. Dykes, a sophisticated, highly educated debtor, understood the consequences of the transaction. Yet the bankruptcy court found his testimony not credible.

Debtors argue that Mr. Dykes had no way of knowing the fair market value of the watches at the time of their return. That may be true. But he could have matched each watch with an invoice in his possession, noted the purchase price charged by Bellusso, and demanded that Bekhor document the amount each returned watch would reduce his unpaid judgment. This information would have permitted Mr. Dykes at the time, and the Chapter 7 trustee after the petition was filed, to challenge Bekhor's unsecured claim for the full amount of his confession of judgment.[6] Instead, Debtors provided no records supporting the valuation of the returned watches. Moreover, the mismatches between the watches listed on the receipt and the invoices introduced at trial created serious, unanswered questions as to the whereabouts of many of these assets as well as the legitimacy of Bekhor's bankruptcy claim.

---

[6]In April 2017, after the Trustee filed its discharge claim but before trial, Bekhor filed an amendment reducing his unsecured claim to $300,669.84 without explanation. We express no view as to the legitimacy of that claim. That is an issue for the Chapter 7 trustee in administering the bankruptcy estate.

### III. Conclusion.

For these reasons, we agree with the BAP that the bankruptcy court did not err in denying Debtors a discharge in bankruptcy under 11 U.S.C. § 727(a)(3) based on its findings that Debtors unjustifiably failed to keep adequate records of financially significant watch and jewelry transactions. Like the BAP, we need not address the bankruptcy court's alternative rulings denying discharge under §§ 727(a)(4)(A) and (a)(5). The judgment of the bankruptcy court is affirmed.

——————————————————